ORESTES HUBBARD v. SAMUEL S. BRIGGS.

False affirmations made by the defendant with intent to defraud the plaintiff, and by which the plaintiff is damnified, are a foundation for an action.

To lay the foundation for such action — in the nature of an action on the case for deceit — it is not necessary that the defendant should be benefited by the deceit, or in collusion with the party that is benefited.

To sustain this action, it is enough for the jury to find that the plaintiff was moved by the false representations of the defendant, so that without them, he would not have acted in the premises whereby he was damnified, although representations made by others had some influence upon his mind.

Where the plaintiff had thus been induced to subscribe to the capital stock of an insolvent bank, and to give his bond and mortgage to secure the payment of his subscription, he had been damnified, although the subscription had not actually been paid.

Such bond and mortgage being assigned to, and deposited with, the comptroller as security for circulating notes of the bank, the plaintiff would be estopped from denying its validity in his hands.

So, likewise, where the bond and mortgage had been sold by the comptroller in the presence of the plaintiff, and without any objection on his part, the plaintiff would be estopped from denying its validity in the hands of such purchaser.

THIS was an action on the case, commenced in 1843, to recover damages for an alleged fraud, which consisted in making false representations concerning the soundness and solvency of the Millers' Bank of Clyde, whereby the plaintiff was induced to subscribe $5,300 to the stock of that institution, and to give his bond and mortgage for the amount of his subscription. The declaration contains several counts, in which the defendant is charged with representing, or causing to be represented, to the plaintiff, that said bank was then, &c., sound and solvent, &c.; that the plaintiff was induced thereby to take the stock; and that the representations were false and fraudulent. The plaintiff alleged that he had sustained injury, in consequence, &c., alleging, in one count, that he lost the money secured by bond and mortgage; in another count, that he was likely to lose it; in another, that he paid for the stock, and that it was of no value; and in another, that he took the stock at the price of $5,300 to be paid, and it was of no value. The plea was the general issue.

This cause was tried, for the seventh time, at the Wayne Circuit, in April, 1863, and a verdict for the plaintiff was obtained, on which a judgment was entered. This judgment was affirmed by the General Term; and an appeal was taken to this court by the defendant.

*George F. Comstock,* for the appellant.

*T. R. Strong,* for the respondent.

WRIGHT, J. The case, in some of its features, is interesting. It was an action commenced in 1843, to recover damages for an alleged fraud, which consisted in making false representations concerning the soundness and solvency of the "Millers' Bank of New York" (an association at Clyde, formed under the general banking law), whereby the plaintiff was induced to subscribe $5,300 to the stock of that institution, and to give his bond and mortgage for the amount of such subscription. In the several counts of the declaration the defendant was charged with representing, or causing to be represented to the plaintiff, that the bank was in a good, safe, sound, solvent and prosperous condition; that it had done, and was doing a good and profitable business, and had made profits by its business, &c., and that the plaintiff was induced thereby to take the stock, and that the representations were false and fraudulent. As to the injury to the plaintiff, it was alleged in one count that he lost the money secured to be paid by the bond and mortgage, and the value of the mortgage, and the land conveyed thereby, and the nominal price and value of the fifty-three shares of stock; in another, that he was likely to lose the $5,300, the price agreed to be paid for the stock, and secured by the bond and mortgage; in another, that he paid for the stock, and the stock was of no value; and in another, that he took the stock at the price of $5,300 to be paid, and it was of no value.

The case has been twice in this court on appeal, and was tried for the seventh time in April, 1863, when the plaintiff had a verdict. This trial seems to have proceeded with great deliberation and care. No exception was taken to the

charge of the judge; and every request of the defendant's counsel to charge, having any materiality or application to the case (except the request to instruct the jury that their verdict should be for the defendant), was complied with. Unless, therefore, upon the merits the plaintiff ought to have been nonsuited, or a verdict directed for the defendant, or there was some ruling as to the admission or rejection of evidence prejudicing the defendant, the judgment should be affirmed.

The case will be better understood by an allusion to the leading facts deducible from the evidence. The Millers' Bank of New York was organized under the general banking law, about the 1st of December, 1838, the association consisting originally of five persons with a declared capital of $300,000. Each of these persons subscribed for six hundred shares of the stock, but paid no considerable part of their subscriptions in cash. In fact, the bank started on credit. One hundred thousand dollars of Arkansas stocks were bought on credit from one Beers, a broker, at six per cent premium, to be paid for in monthly installments of $10,000 each; and all the payments ever made for them were in the circulating notes of the bank, or by turning out customers' notes which the bank had discounted. The association deposited with the comptroller $70,000 of these stocks, and $50,000 of bonds and mortgages taken from subscribers to its capital, in May and June, 1839, and received circulating bills for them. Thirty thousand dollars of the stocks were returned to the broker in the winter of 1840, and for the amount retained, the bank at that time owed Beers $28,000, and in the summer of 1840, when it failed, it had paid but $46,000 in all of the purchase. In August, 1839, the bank received from Ford & Sons, and others, $40,000 of Michigan stocks as security for their notes thereafter given to it. For part of their notes the bank issued time drafts on the North American Trust and Banking Company, payable to Ford & Sons, and Ford & Smith, to pay for part of the stocks. The testimony as to the amount of these time drafts, is quite indistinct, one of the directors estimating the amount at from $10,000 to $15,000. The

bank deposited the Michigan stocks with the comptroller, and received circulating notes for them. In the summer of 1839, it had a suspended debt of over $50,000, which was afterwards increased. The principal debtors were William Ford & Sons, Ford & Smith, Chapman & Frisbie and B. S. Redfield, the cashier. The three firms seem to have had large control of the bank in the spring and summer of 1839, and were the heaviest borrowers. All of them were original directors, and were all reëlected in September, 1839. The time drafts and suspended debts, in the fall of that year, embarrassed the institution. In December, 1839, for the purpose of getting circulating bills, the bank bought $28,000 of Illinois stocks on credit, and deposited them with the comptroller. The bills were used for discounting paper, and some of the discounted paper was assigned to those who indorsed notes to pay for the stock. But little money, comparatively, seems ever to have been paid into the bank; and in order to raise money through the summer of 1839, it sent its bills east, and redeemed them with the flour of Ford & Smith, two of the directors, and who were carrying on the flouring business in the county of Wayne. In July, 1839, it sold $7,000 or $8,000 of its bills in New York, at a discount, to get funds for redemption. In December, 1839, it deposited some $15,000 or $16,000 of its bills with a broker at Albany, and got therefor $4,000 in specie, and a certificate of a specie deposit for the balance, and paid a bonus of three-fourths of one per cent. In January, 1840, the bank had a circulation of over $170,000, without means for redeeming but a small part of it. As early as December, 1839, it had assigned most of its available securities to the defendant and others, to secure them against liabilities incurred for the bank. The Beers debt embarrassed the association to the last. In July, 1840, the bank failed. Through the spring, and up to the time of the failure, various ineffectual efforts were made to sustain its credit, meet its pressing liabilities, and provide for its redemptions. In the spring and summer of 1840, the State stocks held by it depreciated some fifty per cent; a large portion of the suspended debt was lost; and

about the middle of July, some $30,000 of notes being presented for redemption in one day, the institution failed to redeem. On the 18th of July, the bank assigned to the defendant and others, some $39,000 of securities held by it, to secure them against their liabilities for it; and in the following December, it assigned all its effects to a receiver. There was a total loss of the capital, and the securities lodged with the comptroller paid the bill holders but ninety-four per cent.

Thus, it very clearly appears that the institution was embarrassed from the beginning. It started upon a borrowed capital, and that debt oppressed it throughout all its existence. No stock was really subscribed for until April, 1839, when, in that and the two succeeding months, there was a subscription of $60,300; the sum of $5,400 being paid in cash, $3,500 in notes, and $55,400 in bonds and mortgages. Up to January, 1840, it had no other capital except $40,000 of Michigan State stocks brought into the concern, in the summer of 1839, by Ford & Son, Ford & Smith, and Chapman & Frisbee. These parties were the principal borrowers from the bank, and continued to be up to January or February, 1840. Before these stocks were added to the capital the firms borrowed with indorsers, and afterwards, to a large amount, without indorsers; and a part of the stocks were paid for ($15,000) by the bank issuing time drafts, as stated, payable to their order. At the close of the year 1839, the bank was in this condition: It owed $58,000 to Beers for Arkansas stocks; $28,000 for Illinois stocks; it had a suspended debt of $55,000; $29,000 of its assets were pledged to the defendant and others as collateral security; had outstanding time drafts to the amount, say of $15,000; and a circulation of $170,000; and the only available means to redeem this circulation was cash in bank and with their agent at Albany, $28,000, and a margin on State stocks deposited with the comptroller of $28,000 more. On the 1st of January, 1840, two-thirds of the capital of the bank paid in was in the suspended debts and outstanding time drafts;

and it had only $56,000 of available means for redeeming $170,000 of circulating notes.

There is no room for pretending that the bank, at that date, was not in a most unsound and critical condition. A public disclosure of its affairs, then, would have produced an immediate disruption. And so, evidently, some of its directors thought, and accordingly set about procuring new stockholders to carry it along. Meetings were held in at least two places in the county of Wayne, in the interest of the bank, and with the view of procuring additional subscribers to its stock. An effort in this direction, both in concert and singly, was made by the directors, and at a meeting of the board on the 15th January, at the banking house, a resolution was formally adopted (the defendant being present) to meet on the 8th February, at a public house in the town of Wolcott, "to receive subscriptions for stock." A meeting had been held a week or two previously at Red Creek, at which several of the directors attended (including the defendant), having the object in view of inducing persons to subscribe. The plaintiff attended the meetings at Red Creek and at Wolcott. At both these meetings, it was not questioned that three of the directors present, Wells, Chapman and Ford, and others in the interest of the bank, represented to the persons assembled that the bank was in a sound, solvent and prosperous condition. And there was evidence tending to show that before the meeting at Red Creek, the defendant, in urging persons to take stock, represented the bank to be solvent; that he requested one of these persons to see the plaintiff and have him attend the meeting at Red Creek; that at the Red Creek meeting, upon the plaintiff expressing a willingness to go into the bank, provided it was safe and prudent to do so, the defendant represented the bank to be sound and solvent, and in good condition; that it had paid for its stocks and the expenses of getting up the association, and they were making money, and that after all these expenses there was a dividend; that at the Wolcott meeting, although the defendant spoke principally of getting up a flouring association in connection with the bank, he then stated publicly that the

bank was in good condition; they wanted more stockholders; had State stocks with the comptroller, and wanted mortgages to match the State stocks; that shortly after the Wolcott meeting, a rumor having got abroad that the Arkansas stocks were not good, the plaintiff and one or two other persons that had subscribed at the Wolcott meeting, called to see the defendant on their way to Clyde to make inquiry, when he stated that he did not know that the bank had any Arkansas stocks, but that they had better go down to the bank, and he would meet them there; that he considered the bank good, and was intending in the spring to increase his stock $1,000; that they did go to the bank, where they met the defendant, and Smith, Ford and Chapman, three others of the directors; Smith was the principal spokesman; he said they had Arkansas stocks, and he considered them the best they had; that the expenses of starting the bank were all paid; that there was a dividend of $2\frac{1}{2}$ per cent in bank; that the condition of the bank was good, and they wanted mortgages to match stocks in the comptroller's hands; that the State stocks were all paid for; that after paying all expenses and throwing out bad debts there would still be a dividend of $2\frac{1}{2}$ per cent; that Mr. Dezeng had made an investigation into the affairs of the bank, and that his investigation showed the bank good.

The plaintiff had subscribed at the Wolcott meeting for $3,000 or $4,000 of the stock, but had not, at this last interview, given his mortgage to the bank. He concluded to increase his subscription to $5,300, and execute his bond and mortgage for that amount, which was accordingly done a few days afterwards. The bank deposited this bond and mortgage with the comptroller as security for its circulating notes. When the bank failed to redeem, this and other securities with the comptroller were sold by that officer. The sale took place on the 1st April, 1841, both plaintiff and defendant and other parties interested being present, and the plaintiff's mortgage was sold to Harmon Pumpelly. The same day the comptroller executed an assignment to Pumpelly. Before the sale (the defendant being present)

the plaintiff saw Pumpelly, and requested him to buy in his mortgage and give him time to pay, and Pumpelly agreed to do so.   The agreement was that Pumpelly was to bid off the mortgage, and the plaintiff to pay to him seven per cent of the whole amount, and have time to pay the balance. Pumpelly purchased the mortgage under this agreement, and the plaintiff paid down some $300 or $400.

The evidence bearing on the question of the defendant's connection with and knowledge of the condition of the bank, and the motive for the alleged misrepresentations, were of this character : He was a director from its organization until its failure.   He subscribed originally for $8,000 of the stock.   In May, 1839, he gave his bond and mortgage to the bank for $4,500 of this subscription.   He was elected vice-president in September, 1839.   His residence was some five miles from the bank, but during 1839 he attended frequent meetings of the board of directors, and often conversed with co-directors respecting the condition of the association. Ford, Chapman and Smith, in concert with Redfield, the cashier, who lived in the village of Clyde, in a great degree, managed the bank, in the spring and summer of 1839, and largely for their own accommodation, until they had rolled up the large suspended debt.   It would seem that the defendant, although a director, interfered but little in their operations or in the affairs of the institution until the fall of 1839. He knew, however, of their operations and of the suspended debt, and expressed his fears that it would turn out bad, and that the bank could not live under such management.   He thought Ford, Smith and Chapman could ruin the bank, and that they would ruin it if stringent measures were not taken against them.   He was told some three months after the bank went into operation, by one of the directors, that the Arkansas stocks were bought on credit.   He knew of the time drafts having been issued in the summer of 1839, and also that a messenger had been sent west for produce assigned by Ford and Smith, the largest debtors, and had been unsuccessful.   In December, 1839, at a meeting of the board of directors, he moved the purchase of $28,000 of State stocks,

with further resolutions that the obligations or notes of the association be given in payment therefor; that the president and cashier sign such notes, and request individuals to sign with them as sureties of the bank; and that the board pledge the bills receivable and other available means of the bank to such persons as should sign the notes as security. The Illinois stocks were purchased pursuant to these resolutions; the defendant, with others, became liable on the notes given for them; and the bank assigned to them, for their protection, about $29,000 of its securities. About this time, he expressed great uneasiness as to the condition of the bank, and suggested to Griswold, a co-director, to induce others to put in bonds and mortgages, and Griswold declined, saying that he had lost all confidence in banking operations. In December, 1839, the defendant and William Ford proposed to William S. Dezeng, of Geneva, to become the president of the bank, but he did not accept or enter upon the office until about the 8th March, 1840, desiring previously to examine into and endeavor to arrange its affairs, so that it might be carried on. This examination was had in the months of December and January, and before it was completed the meetings were held at Red Creek and Wolcott. When Dezeng took the presidency the bulk of the new subscribers to the stock had been obtained; in fact they were mostly obtained whilst Dezeng was endeavoring to secure the suspended debt and put the bank on such a footing as that it could be continued. Although a year had intervened from the organization, and Beers was to have been paid $10,000 monthly, the bank still owed him $58,000 on the Arkansas stocks, and he was pressing for payment of his debt. The suspended debt was a subject of investigation by Dezeng; he examined the books of the bank and got what information he could from the directors in respect to it, and took fresh securities from some of the debtors. He reported to the directors about the middle of January that he thought the suspended debt secured; and this seems to have been the opinion entertained by the directors, including the defendant, at the time he made his report; although all was eventually lost, except the debt of

Redfield, the cashier.  Nothing was done in respect to the outstanding time drafts, except to consult counsel who advised that the bank was not liable upon them; nor was anything done in respect to the Beers debt, except to induce him to take back $30,000 of the Arkansas stocks, reducing his claim to $28,000, and arranging that that balance should not at once press down the institution.  The proof is strong that in December and January the defendant knew all about the unsound and crippled condition of the bank, and that from December, 1839, if not before, up to its failure, he was one of its principal managers.  He had been always a director; was vice-president from September, 1839; met frequently with the board of directors; moved resolutions in December to purchase Illinois stocks to relieve the bank temporarily from its embarrassments; became security with others for these stocks, and took by assignment to himself most of the available securities then held by the association; he knew that the bank owed the debt to Beers for the Arkansas stocks; he knew also of the outstanding time drafts, and of the suspended debt, and was quite as well able to judge, as Dezeng, a stranger, whether the debt had been made secure or otherwise.  He was made a member of the discount and renewal committee on the 6th January, 1840, and whilst he and others were urging persons to become stockholders, and before any final or definite arrangement had been made in respect to the Beers debt, without the consummation of which, giving him credit for ordinary intelligence, he must have known the bank could not go on.  After the new stockholders had been procured, and during Dezeng's administration (a period of four and a half months), he was acting steadily, in concert with him and others of the directors, in an endeavor to relieve the institution from pressure for liabilities existing before January, 1840, and to relieve himself from individual responsibility.  At a meeting of the board on the 31st March, 1840, he moved a resolution repudiating the time drafts that had been issued by the cashier. The board, at a meeting on the 5th June (when he was present), adopted a resolution to release him from his unpaid

subscription ($3,500) in consideration of his paying his mort-
gage in cash that season; and subsequently, on the 6th of
August, the condition was removed, and he was released
without paying. At the same meeting, in June, the board
authorized the president and cashier, at any time, to transfer
to the defendant and others any securities or funds of the
bank to indemnify them for becoming security to Beers for
$10,000. On the 10th July, the board directed to be placed in
the defendant's hands, securities to indemnify him for having
become bond to Lewis Benedict for the bank in $3,000, this
debt being one of the time drafts which the board had pre-
viously voted, on the defendant's motion, the bank was not
liable to pay. At the same meeting, on the defendant's motion,
and on the ground that a large amount of loans due from per-
sons who could not and did not pay, and the bank was owing
debts to Beers and others, for which some of the directors
were individually liable, the board directed that all interest due
on mortgages given before the 1st January should be collected.
On the 13th August, the board, by resolution, appropriated
to the defendant and Wells each $200, on the ground that
they had from the first organization of the bank devoted
much of their time to its business. At each of these meet-
ings the defendant was present, and if not voting in the
affirmative did not dissent. On the 18th July (after the fail-
ure to redeem) the bank executed an assignment to the
defendant and others of some $39,000 of its securities, to
indemnify them for individual liabilities assumed for the
bank: 1st. To protect and save harmless the defendant from
having become individually liable to Lewis Benedict for
$3,000; 2d. To apply the assets to the payment of notes,
amounting to $24,500, given by the defendant and others on
the purchase of the Illinois stocks in December, 1839, the
bank having used a considerable amount of the securities, as
the assignment recites, pledged to them at the latter date;
and 3d. The residue to constitute a fund to indemnify the
defendant Wells and Dezeng for a liability of $10,000 to
Beers. All these assets went into the hands of the defend-
ant, and he collected them. He never paid anything to the

receiver. He testified himself that he settled with the receiver, but in what way does not appear. It is probable that he lost, eventually, the amount of his bond and mortgage ($4,500), although the fact is not distinctly shown. It was not among the securities sold by the comptroller, although it had been deposited with him.

In the celebrated case of *Pasley* v. *Freeman* (3 Term, 51), it was held that a false affirmation made by the defendant with intent to defraud the plaintiff, whereby the plaintiff receives damage, is the ground of an action on the case in the nature of deceit; and that in such action it is not necessary that the defendant should be benefitted by the deceit, or that he should collude with the party who is. That case, as was said by the court, in *Upton* v. *Vail* (6 Johns., 181), "went not upon any new ground, but upon the application of a principle of natural justice, long recognized in the law, that fraud or deceit, accompanied with damage, is a good cause of action." The doctrine of the case has been since repeatedly recognized, and is well settled in English and American jurisprudence. (*Haycraft* v. *Creary*, 2 East, 92; *Russell* v. *Clark's Exr's.*, 7 Cranch, 69; *Upton* v. *Vail*, 6 Johns., 181; *Allen* v. *Addington*, 7 Wend., 10; *S. C.* on error, 11 id., 375; *Patten* v. *Gurney*, 17 Mass., 182; *Urn* v. *Wilcox*, 1 Day, 22; *Hart* v. *Tallmadge*, 2 id., 381; *Ewing* v. *Calhoun*, 7 Vt., 89; *Weeks* v. *Burton*, 7 id., 57.) Indeed, it is not controverted now, as it could not be, that where a person asserts a falsehood with a fraudulent design, and damage results therefrom, though he may have no interest in the deception, nor colludes with the party who has, it is ground for a civil action. It is not necessary to adopt this doctrine to the fullest extent, in order to maintain the present action. The defendant, if he made the assertion in respect to the solvency, business and condition of the bank (and the jury by their verdict have found that he did, and that they were false), he had an interest in so doing. He was a stockholder and director of the bank, and was also, by his express agreement, individually liable for its debts to a large amount. He was to be personally benefitted by getting in new stockhold-

ers, and the evidence justified the conclusion that he concurred in the efforts to do so. As has been said, however, it was not important for the purpose of maintaining the action, if his affirmations were false, and made with an intent to deceive, and effected the object to the plaintiff's injury, whether he had any interest in making them or not.

The general questions in the case, then, were: 1st. Did the defendant, in January, 1840, represent to the plaintiff that the bank was sound and solvent, and in good condition; that it had paid for its stocks and the expenses of getting it up, and was making money; and that after all the expenses there was a dividend? 2d. Were these representations false, and did the defendant know them to be untrue? 3d. Did the plaintiff act upon the representations in taking the stock, and giving his bond and mortgage? 4th. Was the plaintiff damaged? These were purely questions of fact, and the jury, by their verdict, have answered them against the defendant. They have found that he did make the representations alleged; that they were untrue, and he knew them to be so; and that the plaintiff, in reliance upon them, subscribed for the stock (mortgaging his farm to the bank in payment for it), and that the stock was then, and afterwards, utterly valueless. In short, that a gross fraud was practiced upon the plaintiff, by which he was damaged to the extent of his subscription.

One of the grounds on which a nonsuit was urged was, that the evidence showed that whatever representations the defendant was proved to have made, were made in good faith; there was no evidence that they were made in bad faith. If the defendant ignorantly asserted a lie in his effort to induce the plaintiff to become a subscriber to the stock of the bank, and honestly believed that its condition was as he represented it to be, he would not have been liable. But if his affirmations in respect to its soundness, solvency and business were knowingly false, there could have been no good faith or honesty in uttering them. There was quite enough evidence in the case to go to the jury, both on the questions of the unsound and insolvent condition of the association, and of

the defendant's knowledge of it. If he and other of the directors believed that the suspended debt (equal to half the amount of the then capital of the bank) had been made reasonably secure, this fact would not have relieved him from the imputation of bad faith in representing the condition of the bank as sound, solvent and prosperous, having paid for its stocks and the expenses of getting it up, and was in a condition to declare a dividend to its stockholders. There was abundant evidence to go to the jury of the falsity of these assertions, and that the defendant knew they were false.

After a charge to which no exception was taken (and which was certainly extremely liberal to the defendant), his counsel requested the jury to be instructed that their verdict should be given for him: 1st. On the ground that upon all the evidence the bank was to be deemed solvent when the alleged representations were made; 2d. On the ground that if the bank was then insolvent the defendant had no knowledge of the fact; 3d. On the ground the plaintiff did not give his bond and mortgage relying on the representations of the defendant. This was, in effect, requesting the judge to direct a verdict against the plaintiff for the reason that there had been no fraud or deceit on the part of the defendant occasioning damage to him. The jury had just been instructed to answer the three propositions embraced in the request; and it was certainly, under the evidence, for them to do so, and I think it would have been clear error to have taken the questions from them. The truth is, the request was too narrow and inapplicable to the issues under the pleadings. The defendant represented the bank to be not only solvent, but to have been doing a good business, and as being in good condition, and as having made money. If, upon the whole evidence, the bank was to be deemed *solvent* in January, 1840, or if it was then insolvent and the defendant was ignorant of the fact, those circumstances would not necessarily have led to a verdict in his favor. The questions were, not alone, was it solvent, but was it in good condition for banking; had it been doing a good and prosperous busi-

ness, and had it made money. But had the questions been simply as to its solvency or insolvency and the defendant's knowledge in that respect, the proof was abundant to carry the case to the jury upon those issues. The fact is, that the evidence was conclusive as to its insolvency in January, 1840. It made no bad debts of any amount after that period, yet its whole capital, including that which was obtained after January, was gone the middle of July following, and no considerable part of its debts had been in the meanwhile paid. As to whether the plaintiff subscribed, and gave his bond and mortgage, relying on the representations of the defendant was eminently for the jury to settle. On this point the evidence was conflicting. The plaintiff himself testified that he relied wholly upon the defendant's representations; whilst, on the other hand, there was evidence tending to show that he was influenced by Chapman and other directors of the bank, and that it was an afterthought to charge the fraud upon the defendant. It was enough to have sustained the action against the defendant, for the jury to have found that the plaintiff was moved by his representations, so that without them he would not have subscribed for the stock, although representations made by others had also influence upon his mind. It could not be affirmed, as matter of law, upon the proof in the case, that the defendant's affirmations were not the inducing cause of the plaintiff's subscription; and if not, the question properly belonged to the jury to determine.

Another ground, and the principal one, on which the motion for a nonsuit was based was, that no legal damage had resulted to the plaintiff from the fraudulent declarations of the defendant, he having paid nothing for the bank stock in question, but covered the amount of his subscription by a bond and mortgage that was void in the hands of the bank or of the comptroller, or his assignee. I think this ground more ingenious than sound. It assumes facts, and jumps at the conclusion that, as between the bank and the plaintiff, the original parties to the securities, they were absolutely void by reason of the defendant's fraud. The securities were

not void, but voidable, at the election of the plaintiff, and then only if obtained by the fraud of the bank, as a corporation. It certainly cannot be pretended that if by fraudulent statements of the defendant (the corporation not being implicated in the fraud), the plaintiff was induced to subscribe for the stock and give his bond and mortgage therefor, the securities would not be legally valid as between the parties to them. I admit this would be otherwise if the bank, as a corporation, were the party guilty of the fraud, or had notice of it, or if the defendant, in making the representations or procuring subscriptions for stock, acted as its agent. But there was nothing implicating the board of directors in the fraud practiced by the defendant. He made the alleged false declarations, not as a member of the board, but as an individual. I think it extremely doubtful, as the proof stood, whether the defense of fraud was available as against the bank. But, assuming that the plaintiff might have avoided the bond and mortgage in the hands of the bank, I am clearly of the opinion that in a suit by the comptroller, or his assignee, under the facts shown, he would be estopped from setting up their invalidity. The evidence authorized the jury to find that the plaintiff executed the bond and mortgage with the view of having them assigned to the comptroller as security for bank notes; that he consented that they should be so assigned for that purpose; that they were accordingly so assigned with his assent; and that upon their security the comptroller issued circulating notes to the bank. The case is, therefore, the same, in point of law, as though the plaintiff had personally participated in depositing the bond and mortgage as security for circulating notes, and had asserted to the comptroller that they were valid securities. If he had done this, even in good faith, not having discovered the fraud which he now asserts, it is clear from the authorities that he would have been precluded from setting up that the securities were invalid. (*Petree* v. *Feeter*, 21 Wend., 172; *Watson, Executor*, v. *McLaren*, 19 Wend., and cases cited; *Lamoroux* v. *Visscher*, 2 Comst., 278; *Kensly* v. *Vernon*, 4 Sandf., 361.) The rule need not be

denied that choses in action of this nature are *prima facie* impeachable, as well in the hands of an assignee as of the original party, but the conduct of the obligor or mortgagor may be such as to preclude him from the benefit of the right. The plaintiff, after consenting to the assignment of the mort- gage to the comptroller as security for circulating notes, and asserting that it was a valid security and would protect the bill-holders to the extent of the amount purporting to be secured by it, could not afterwards defend himself against the comptroller in an action on the security. Under such circumstances, it would be unjust and inequitable that the bill-holders, for whom the comptroller was the trustee, should suffer the loss rather than the mortgagor by whose act an invalid security was taken. In *McMullen* v. *Warner* (16 Serg. & Rawle, 21), in speaking of a bond which had been assigned, the court laid down the rule with precision. It said: " Al- though *prima facie* the obligor may make every defense against the assignee, which at the time of the assignment, or notice of it, he could have made against the obligee, yet he may, by his own conduct, preclude himself from the benefit of that right. Thus, it has been held, that if the assignee calls on the obligor and informs him that he is about to take an assignment of the bond, and the obligor acknowledges that it is due, without any allegation of defense, he shall not be permitted to take defense against the assignee; and this, whether his silence proceeds from ignorance or design. It would be most inequitable and unjust if he should; because if any loss afterwards occur, it arises from the negligence or folly of the obligor, and not the default of the assignee, who has taken every pains to inform himself of the real situation of the parties. If any injury accrues, it is right that he who causes it should bear the loss." Again, in view of the cir- cumstances of the comptroller's sale and assignment of the bond and mortgage to Pumpelly, there can be no doubt, in a suit by Pumpelly, the plaintiff could not defend himself against the latter in an action on the securities. The plain- tiff stood by, in silence, and saw Pumpelly purchase the bond and mortgage and pay value for them. Nay, he did more

than to stand by in silence. He urged Pumpelly to become the purchaser, and agreed with him, if he did so to pay him down seven per cent of the whole mortgage. It is said there is no proof that Pumpelly paid anything beyond the one dollar expressed in the written assignment. If this were so, it would be of no importance on the question we are considering; but it is not so. The evidence tends to show that Pumpelly paid the full amount of the mortgage. The agreement was for him to bid it off, and upon the plaintiff paying down seven per cent of the whole mortgage, he should have time to pay the balance. The plaintiff paid him $300 or $400 (which was not one year's interest, as is claimed, but seven per cent of $5,300). Most clearly the conduct of the plaintiff at the comptroller's sale, his standing by in silence, and his connection with Pumpelly, who became the purchaser at his instance, estopped him, notwithstanding he acted in good faith and had not then learned that the representations which the defendant had made to him were false.

If it were conceded, then, that the bond and mortgage were void as between the original parties (which I am by no means willing to concede), the plaintiff could not have avoided them in the hands of the comptroller or Mr. Pumpelly. It is incorrect, therefore, to say that he never paid, and is not bound to pay his mortgage, and hence sustained no damage from the defendant's fraud. The jury have found that he was induced by the false and fraudulent affirmations of the defendant, to take fifty-three shares of worthless bank stock, and give a mortgage lien on his lands for $5,300, as the consideration for the purchase. As he is bound to pay the mortgage, and cannot defend himself against it, it would seem to be reasonably plain that he has been injured. It is not denied that if, at the comptroller's sale, and before he discovered the fraud, the plaintiff had paid his mortgage, the action would have been sustainable against the defendant, as then the party defrauded would have been legally damnified; but the distinction seems to me exceedingly thin, between damages arising from actual payment, and having a mortgage

lien for the consideration money on the defrauded party's lands, admitted to have been worth some two thousand dollars more than the amount of the lien.

The defendant's counsel took over seventy exceptions during the progress of the trial, many of them of the most trivial nature, and but few were urged on the argument. Some of them will be briefly noticed.

1. It seems that in 1841, proceedings were commenced in chancery by certain parties against the bank to have their mortgages delivered up to them and canceled. Depositions were taken before an examiner in 1842. Elias T. Munson was one of the persons examined. On the present trial, the plaintiff testified that he did not find out that the defendant had knowledge of the bad condition of the bank, until the testimony in chancery was taken; he found it out from the testimony of all the witnesses; he thought Munson testified to it. When the case was about closing, the defendant offered in evidence the deposition of Munson, and also all the depositions taken in chancery, for the purpose of contradicting what the plaintiff swore to in regard to the depositions, and to show that there was nothing in the evidence to charge the defendant with fraud. This batch of chancery depositions were properly excluded. It is impossible to see upon what principle the testimony of third persons, taken in a chancery suit in 1842, to which the plaintiff was not a party, was material or competent evidence in the case. If it was at all important to contradict the plaintiff as to the time he said he found out that the defendant had knowledge of the condition of the bank, it could not be done in that way.

2. Pursuant to a stipulation of the parties, the testimony of Munson, who was dead, given on a former trial of the case, was read in evidence. Subsequently the defendant offered to read the deposition of Munson in the chancery suit, for the purpose of contradicting his evidence as read, and impeaching him. The testimony was objected to, on the ground that the attention of the witness Munson was not called to the subject, and the court sustained the objection

This was not error. Had the witness been living, and on the stand, it would not have been competent, by way of impeachment, to show that he made different and contradictory statements on other occasions, without first calling his attention to them. Without this, there is no foundation laid for the evidence. It cannot change the rule because the witness is dead, and the parties have stipulated that his evidence might be read as he gave it on a former trial.

3. It was proved that shortly after the Wolcott meeting the plaintiff and others called upon the defendant at his premises, to make inquiry as to some stocks in the bank which they had heard were not considered good. This was before the plaintiff had given his bond and mortgage. The defendant expressed surprise; said that he had heard of no such thing; that the bank was in good condition; they had better go down to the bank and he would meet them there. They did go at his request, and he met them at the bank, and also others connected with it. The plaintiff was allowed to prove that, at this meeting, invited by the defendant, Smith, one of the directors, in the presence and hearing of the defendant, showed a paper exhibiting the affairs of the bank; went on to say that its condition was good; that he had made a calculation, by throwing off so much for bad debts, if there were any — he did not think there would be any — there would still be a dividend of 2½ per cent over expenses; and that all the State stocks which they had were paid for. To the introduction of this evidence the defendant objected. I think the admission of it was not ground for an exception. The plaintiff had met the defendant at the bank by the request of the latter. It may be conceded that the defendant could not be charged on the representations of Smith, though made in his presence and hearing, but still I think the evidence was not incompetent. It is to be remembered that this interview was after the alleged representations were made by the defendant. His conduct on the occasion tended to show a fraudulent intent. He remained silent when Smith and others were making statements to the plaintiff, respecting the bank, which he knew to be false.

4. The defendant made a speech at the Wolcott meeting, principally respecting the advantages of getting up a flouring association in connection with the bank, but took occasion also to represent the bank itself to be in a flourishing condition, and wanted mortgages to match its stocks on hand. These statements were made when the plaintiff was present, and when he subscribed $3,000 or $4,000. The evidence was unobjectionable. Even if what the defendant said had been confined exclusively to urging the advantages of the flouring association, the admission of the evidence could not have prejudiced him.

5. The case was one of fraud, and ordinarily such a case is not capable of being established by direct affirmative proof. Any evidence having a tendency, though it may be slight, to establish fraud is not incompetent. Necessarily, considerable latitude is to be allowed in giving evidence of circumstances tending to prove the fraudulent intent. Evidence bearing upon the questions of the actual condition of the bank when the alleged representations were made, the defendant's knowledge of its condition, and whether such representations were made with the design to deceive or mislead, was legitimate and proper. This consideration answers many of the objections taken to the proof on the ground of irrelevancy. It was certainly not objectionable to show that the bank started with a heavy debt, which was never wholly paid; that up to January, 1840, it had paid no part of the debt, except in its own circulating notes; that the defendant knew of the existence of this debt; that the very persons who were the original projectors of the association, with but limited means, had in less than six months after its organization borrowed from it, and had not repaid, to an extent that placed it on the verge of bankruptcy; that the defendant knew this, and to save the institution, as a director, moved in December, 1839, the purchase on credit of $28,000 of stocks, and became personally bound; that this personal liability existed when he was urging the plaintiff and others to become stockholders, and when he represented the bank to be sound, solvent and in good condition; that the same

embarrassments which existed when the representations were made, although various efforts were made by the defendant and his associate directors to relieve from them, continued to the end, notwithstanding additional stockholders had been obtained, and the bank lost nothing in bad debts after February, 1840; that the defendant, though he had subscribed for $8,000 of stock, was released from $3,500 of the subscription; and that finally, when the concern came to explode, which was in a little over four months after the plaintiff gave his bond and mortgage, he took to himself a large share of its assets by way of indemnity against the identical liability he had incurred, as surety, for the stocks purchased in December, 1839. Some of these matters, and the defendant's knowledge of them, were proved by witnesses, and others by the minutes of proceedings of the board of directors, when the defendant was present and participating, and by the several assignments to him by the bank. Objection was made to the introduction of the minutes of the director's proceedings as testimony in the case, or rather to certain parts of them, on the ground of immateriality and irrelevancy. These resolutions supposed to be especially irrelevant were the one offered by the defendant himself, in December, 1839, to buy $28,000 of stocks on credit; another offered by him calling on debtors of the bank to pay, and requiring interest on mortgages before January, 1840, to be collected with the view of relieving him and others from individual liability; and another releasing him from part of his subscription. These, instead of being immaterial and irrelevant, went strongly to show the falsity of the defendant's representations to the plaintiff respecting the bank; his knowledge that they were false; and a guilty motive in making the misrepresentations.

6. On the cross-examination of Aaron Griswold, one of the defendant's witnesses, the plaintiff's counsel was allowed to inquire of him: 1st. Is it probable the parties talked together at Red Creek? To which he answered: It is probable, although I have no recollection of it. 2d. Is it not probable you saw them? The answer to which was: I may

have seen them. Allowing these questions and answers is claimed to be error that should lead to a reversal of the judgment. I think the objection of the most frivolous nature. The questions were proper enough on a cross-examination, but if this were otherwise, the answer could not possibly have prejudiced the defendant.

7. Elizabeth Sampson, a colored woman, who lived in the family of the defendant in December, 1840, was called, among others, to prove declarations of the plaintiff alleged to have been made at an interview and conversation with the defendant at his house, at the time mentioned, to the effect that the defendant had never said anything to induce him to take the stock; that Chapman was the man that influenced him, and that he only blamed the defendant because he did not contradict what others said. The testimony of the four other witnesses was read from a printed case, but this colored woman was examined orally. On her cross-examination she was asked to detail her former evidence in 1848. She related with great precision her direct examination, but had wholly forgotten her cross-examination. Subsequently the plaintiff offered to read in evidence her cross-examination taken, as the case states, in 1858, but which is doubtless an error, and should be 1848. No objection was made that the foundation for the evidence had not been laid, but the simple objection was, that it was immaterial and incompetent. I think the evidence was properly received. But if otherwise, it could not be ground for a new trial. The evidence was wholly unimportant in its bearing on any of the issues in the case, and could not by possibility have worked any injury to the defendant. Nor was there anything in it tending to discredit the witness or capable of being used for that purpose. The single fact shown by the introduction of it was, that the witness, after a lapse of fifteen years (or five years, if the examination was in 1858), failed to remember all her testimony on a former trial.

8. The defendant's counsel requested the judge to instruct the jury that the defendant was not chargeable with a knowledge of the insolvency of the bank, even if he erred in

judgment of the fact, provided his error was an honest one. The judge charged the proposition in the affirmative, provided the defendant exercised ordinary care and prudence; and there was an exception on the ground that the proposition was not charged without the qualification. This exception is claimed on the points of the defendant's counsel to have been well taken, but no reason is given for the assertion. On the contrary, I think the response of the judge to the request was quite as favorable as the defendant could ask. The proposition was, in a great degree, an abstract one under the proof in the case. If it had any meaning it was this, that if, as a director, the defendant, without any effort to investigate or inform himself, had erroneously but honestly adjudged that his bank was solvent, when it was actually insolvent, he, as matter of law, was not chargeable with a knowledge of such insolvency. Such a proposition is certainly not sustainable, and the qualification of it by the judge was an eminently proper one.

I am of the opinion that the judgment should be affirmed. No errors to the prejudice of the defendant occurred in the progress of the trial. The case was fully and fairly submitted to the jury upon the single issue of the defendant's liability for what he had said and done; and there is no room to doubt the fact that the jury have passed upon that distinct and isolated question. Their decision should end a litigation that has been protracted for nearly a quarter of a century.

Denio, Ch. J., and Brown, J., fully concurred in the above opinion. Porter, Campbell, Davis and Davies, JJ., on the ground, as expressed by Judge Wright, that the plaintiff would be estopped from defending an action on the bond and mortgage in Pumpelly's hands.

Judgment affirmed.