Statement of case.

John Marsh, Appellant, *v.* Joseph Falker, Respondent.

False representations as to the solvency or pecuniary condition of another, to be actionable as fraudulent, must, at the time, have been known to have been false by the party making them, or he must have assumed, or intended to convey the impression that he had, actual knowledge of their truth, though conscious that he had no such knowledge.

The defendant, on being told by the plaintiff that K. had applied to him to purchase certain goods on credit, and that he (the plaintiff) wanted to know if K. was responsible, stated that K. was perfectly good, good for $17,000 or $18,000 in property in Syracuse, and that if the plaintiff took K.'s note, he (the defendant) would discount it; thereupon the plaintiff sold K. the goods. K. had real estate in Syracuse worth between $10,000 and $20,000, but encumbered to its full value, and he was, in fact, wholly insolvent, but the defendant was not shown to have known the real condition of K.'s affairs, or that his own representations about them were not true, and himself swore the contrary. He was a trader, engaged in the same kind of business and residing in the same city with K. *Held* (Hunt, Ch. J., and Mason, J., dissenting), that an action against him on account of these representations as fraudulent, could not be maintained.

*Bennett* v. *Judson* (21 N. Y., 238), commented upon and explained.

This action was brought to recover damages alleged to have been occasioned by certain fraudulent representations made by the defendant to the plaintiff, concerning the responsibility of Isaac Kahn. At the time when it was claimed, upon the trial, that the representations were made, which was in January, 1860, the plaintiff was engaged in business at the city of Auburn, manufacturing leather and dealing in sheep skins. Kahn then had a leather store in Syracuse, where he also dealt in sheep skins, and the defendant carried on business in the same place as a dealer in liquor, cigars, hides and pelts. The evidence tended to show that the plaintiff called at Kahn's store, between the 8th and 12th of January, 1860, and he then applied to the plaintiff to sell him sheep skins, on four months' credit. The plaintiff promised to see about it before he went home. Before the plaintiff concluded to sell the skins on the terms proposed, he called at the defendant's store and found him conversing with two or three other persons. At the plaintiff's

desire, they retired to the defendant's counting room; and there the plaintiff testified he stated to the defendant that Kahn wants to buy some skins of me on time, and I want to know if he is responsible." He said Kahn was perfectly good; good for $17,000 or $18,000 in property, in Syracuse and if I took Kahn's note, he would discount it for me. The plaintiff testified further, that he soon afterwards called upon Kahn and informed him that he would sell him what skins he wanted and take his note on four months' time. And on the 16th of January, 1860, he did sell and deliver to him sheep skins to the amount of $150, and took his note for the price, due in four months from that time.

Kahn, at the time of this purchase, owned several pieces of real estate in the city of Syracuse, which were variously estimated by the witnesses at from $8,000 to about $20,000 in value. But they were encumbered to such an extent as actually to be worth nothing over the encumbrances. His stock in the store appears to have been slightly over $4,000 in value ; the debts owing to him about $10,000, and those owed by him about the same amount. In August or September, 1859, the defendant and Kahn bought and sold pelts upon joint account, to the extent of $6,000. The defendant furnished the money to buy such pelts, and they were stored at his store. The defendant was in the habit of loaning money to Kahn every week. These loans varied from $100 to $300 each in amount, but did not exceed $200 at a time. The plaintiff read in evidence the testimony of the defendant taken on an occasion previous to the trial, and from that it appeared that Kahn spoke to the defendant about buying out his stock near New Years in 1860, without giving any reason for desiring to sell; and that they afterwards talked about it every three or four weeks. On the 25th or 26th of March, 1860, the defendant and Abraham Kraft did buy Kahn's stock. Two days before the sale Kahn told the defendant he would sell his stock for liquors and $1,000, in cash; that he was sick of the leather business and could not make anything in it; and the sale was made substantially on

those terms. Kahn was to sell his stock at cost price, with transportation added, and have the liquors at the wholesale prices, and they were delivered to him on the 26th and 28th days of March, 1860. The defendant testified that he did not know anything about Kahn's intention to go away when he purchased from him these goods; but that in about an hour after they settled up on the 29th, Kahn told him he was going to New York and from there to Europe; and that he would return in four or six weeks. He left in the afternoon, the defendant parting with him at the cars.

A witness who occupied the store next to that occupied by Kahn, stated that he had known him six or eight years; had made call loans to him occasionally; and that he was reputed to be responsible. On his cross-examination he said he had heard nothing said about his standing. The defendant testified that he regarded him as a man of good credit, and worth as much as the plaintiff testified he represented him to be. The plaintiff testified that the defendant informed him, after Kahn had left, that he had his property, and would pay the note he had given the plaintiff if the latter would keep cool.

When the evidence was closed, the defendant moved for a nonsuit on the ground that there was no question of fact for the jury to pass upon. A similar motion was also made at the time the plaintiff rested, on the ground that there was no evidence that the defendant knew or suspected that Kahn was not responsible, or that he did not make the representations in good faith, believing them to be true, and that he had good reason to believe that they were true. The motions were denied and the defendant excepted. The jury found for the plaintiff and the court ordered the exceptions to be first heard at General Term. Upon the hearing of the exceptions, that court set aside the verdict and directed a new trial. From the order then made the plaintiff appealed, giving the stipulation required by the Code in such cases.

*Daniel Pratt*, for appellant.

*Charles S. Andrews*, for respondent.

DANIELS, J.   The representations, which the plaintiff's evidence tended to prove were made to him in this case, were sufficient, if they were fraudulently made, to warrant a recovery in his favor; for it was shown that Kahn was insolvent, and the jury would have been justified by the evidence, in finding that they induced the sale and produced the loss which was occasioned by it.   But before the plaintiff could lawfully recover that loss from the defendant, it was equally as essential to the right to do so, that he should satisfactorily prove that these representations were fraudulently made.   That they were not only false in fact, and caused the loss sustained by him, but beyond this, that they were made with the intent to deceive him.   This was the gist of the action, and it has always constituted its distinguishing element; and as such it has been described and maintained by all the authorities.   (*Pasley* v. *Freeman*, 3 Durnford & East., 44; *Upton* v. *Vail*, 6 John., 181; *Young* v. *Covell*, 8 John., 24; *Watson* v. *Poulson*, 7 Eng. Law and Eq., 585; *Bainard* v. *Spring*, 42 Barb., 470; *Wakeman* v. *Dalley*, 44 Barb., 498, 501; *Viele* v. *Goss*, 49 id., 96; *Zabriskie* v. *Smith*, 3 Kernan, 322, 330; *Hubbard* v. *Briggs*, 31 N. Y., 518, 529); and *Chester* v. *Comstock*, decided at the March term of this court.

The case of *Bennett* v. *Judson* (21 N. Y., 238), has been pressed upon the consideration of the court as an authority establishing a different doctrine.   And a casual reading of it may tend in some measure to support that conclusion.   But neither the facts upon which it was decided, nor the opinion given by the court will maintain that result.   That was an action for damages sustained by means of fraudulent representations made by the defendant's agent, upon the sale of lands situated in the States of Indiana and Illinois.   The representations appear to have been made by the agent upon the faith of certain information derived by him from a source apparently entitled to confidence and credit; and to that extent there was no reason for supposing them to have been made with the intent to deceive the plaintiff.   But the agent

went beyond the point of representing to the purchaser merely that which he had good reason to believe was the truth. For he made the representations in such a manner and in such terms, as were calculated to produce the conviction in the mind of the purchaser, that he had personal knowledge of their truth. That instead of being the result of information derived by him, he had actual knowledge acquired by occular inspection and personal examination. That he made the statements, on which the purchaser relied, upon what he knew as distinguished from what he had heard. This was not true, and he himself knew at the time it was not true; and from those circumstances, the intent to deceive the purchaser could very naturally be inferred.

The difficulty in the case was as to the existence of the fact, arising out of the common habit of mankind to express themselves in positive, unqualified terms where their statements are dependent upon their faith in the veracity of others. Where convictions thus derived may be inadvertently expressed in positive terms without any intent to deceive, they would be insufficient to sustain an action of this nature because the design to defraud would be excluded from the transaction. In many cases it may be, and undoubtedly is, exceedingly difficult to distinguish cases of this character from those where a positive expression importing actual knowledge constitutes the representation made and complained of. But the distinction is one that is well founded in fact and clearly maintained in law; and where nothing is exhibited by the evidence that, fairly and reasonably construed and understood, will lead to the conclusion that a positive expression of knowledge was adopted for the purpose of producing a false impression, and with the design to deceive the person to whom it is made, and who is expected to act upon it, no reason can exist for presuming that to be the fact. For in all actions for deceit the presumption is in favor of innocence; and on that account the intent or design to deceive the plaintiff must be affirmatively made out by evidence. (*Starr* v. *Peck*, 1 Hill, 270, 272-3.) But the cir-

cumstances attending, and the motives leading to the trans-
action itself, may, and often will be of such a nature as to
supply this evidence.

In order to determine whether representations of actual
knowledge of the existence of material facts be deceitfully
or fraudulently made, or whether that may be properly and
fairly inferred, regard must be had to the transaction in
which they are made, and to the subject to which they
relate; for, as to many subjects of trade and traffic, the
acquisition of such knowledge is common, and, therefore,
when imported by the representations made, it may be rea-
sonably expected to have been intended that the person to
whom they may be made should understand that to be their
character. As to many other things, the possession of actual
knowledge is exceedingly rare and exceptional, and when
representations are made concerning them, they are usually
understood as amounting to no more than the candid and
sincere convictions of the person making them. They are
expressions of opinion or judgment, rather than absolute
representations of fact, and as such are not necessarily
fraudulent, though they afterwards turn out to be wholly
unfounded and untrue. If they are made in good faith the
person making them cannot justly or legally be held liable
for the consequences resulting from them to the person who
may afterwards act upon them. Upon this subject Chancel-
lor KENT stated the law to be that "misrepresentation with-
out a design is not sufficient for an action; but if recom-
mendation of a purchaser as of good credit to the seller be
made in bad faith, and with knowledge that he was not of
good credit and the seller sustains damage thereby, the per-
son who made the representation is bound to indemnify the
the seller. (2 Kent, 490.) This rule places the liability of the
defendant upon the true ground, exonerating him where he
may act in good faith and still err in his judgment, and ren-
dering him responsible where he knowingly misinforms the
applicant for the purpose of deceiving him.

The representations relied upon for a recovery in this case

related to a matter that could not ordinarily be expected to be within the knowledge of the person making them. There is nothing in the case in any way indicating that the plaintiff had any reason for supposing that the defendant possessed any other knowledge upon the subject concerning which he was applied to for information than that which one person in business will commonly acquire concerning others in the same business, residing in the same place. It was not stated by him that he understood that the defendant and Kahn had ever been jointly engaged in the business enterprise which they carried on in August or September, 1859, or that the defendant had ever in any manner acquired any certain personal knowledge of the situation and circumstances of Kahn. For that reason, it could not be inferred that the plaintiff, when he applied to the defendant for information, expected he would be able to obtain anything beyond his best judgment upon that subject; and if he had expected any more than that, there is no reason for supposing that he could have obtained it; for the business the defendant was in with Kahn, in August or September, 1859, was quite limited in its nature, so much so as to exclude the idea that it would necessarily have supplied him with any accurate or particular knowledge of Kahn's circumstances; and what transpired when Kahn applied to the defendant to buy him out soon after New Year in 1860, was not calculated to give him any further knowledge on that subject, for no reason was then given why he wished to sell out his stock in trade. The additional circumstance that he was in the habit of loaning Kahn money from time to time, furnished no substantial reason for doubting his solvency, for it was not shown or claimed that Kahn had ever failed to make prompt paymer of what he had borrowed; and if he had not, that circu stance of itself would have had a natural tendency to increas rather than diminish his credit with the defendant.

No understanding or expectation was shown to have existed until upwards of two months after the representations were made that the defendant should purchase any of

Kahn's accounts or his stock in trade, and, therefore, no reason existed for claiming that the latter transaction was in any manner connected with the former. Neither this circumstance nor the promise, which the plaintiff testified the defendant made, to pay the note after Kahn had absconded, in any way tended to establish the conclusion that the defendant intended to deceive the plaintiff in the statement he had made concerning Kahn's responsibility. His business standing at the time, and the visible property he then had were sufficient to create the belief in the mind of a person not acquainted with the encumbrances upon it and the debts owed by him, that he was worth the amount claimed to have been mentioned by the defendant; and in the absence of anything tending to a contrary conclusion, it should be assumed not only that these formed the basis of the defendant's statements, but in addition to this that the matter was so understood by the plaintiff at the time. He applied to the defendant for the best general information he was able to give him as a person in the same trade, carrying on business at the same place, and therefore presumed to know what persons similarly situated usually learn concerning the standing of their neighbors, and this was fairly, but as it afterwards transpired, mistakenly given. There is no established principle of law which will render a person liable for the consequences resulting from mistakes of that character. They constitute a portion of the risks of trade, to be borne by those who take and act upon them. And so it has been held in three well considered instances. (*Haycraft* v. *Creasy*, 2 East., 92 ; *Russell* v. *Clark's Ex'rs.*, 7 Cranch, 69, 93; and *Chester* v. *Comstock*, *supra*.) The burden was on the plaintiff of showing either that the defendant knew, or had good reason for believing that Kahn was insolvent, and that the representations were therefore false when they were made; or that he intended that the plaintiff should understand him to be communicating his own actual knowledge by means of them, when he possessed no knowledge upon the subject. The evidence, in its most favorable view for the plaintiff's

case, failed in both these respects; and for that reason the Circuit Court erred in declining to nonsuit the plaintiff. The exceptions were well taken, and the general term was right in setting aside the verdict. The order should be affirmed and judgment awarded to the defendant.

GROVER, J. The judge did not err in receiving testimony of what the defendant testified to upon the trial of the action brought by Anable & Co. against him. This testimony, among other things, tended to show the pecuniary condition of Kahn, in March, a little more than two months after the alleged making of the fraudulent representations as to such condition by the defendant to the plaintiff. The lapse of time was not so great as to destroy all presumption that such condition was substantially the same in March as in the preceding January, in the absence of all proof tending to show any intermediate change. The objection was general to the entire testimony, upon the ground that it was immaterial. If any part of the testimony was competent for any purpose, the objection was properly overruled. The question arising upon the exception taken to the refusal of the judge to grant a nonsuit, at the close of the plaintiff's proof, need not be examined, for the reason that a like motion was made at the close of all the evidence and a like exception taken to its refusal. Had there been a material defect in the plaintiff's proof when he rested, entitling the defendant to a nonsuit, an exception to its refusal would be unavailing, in case such defect was supplied by testimony subsequently introduced by either party. In examining the latter question, the truth of all facts sustaining the plaintiff's case must be assumed, in support of which any evidence was given, unless there was such a preponderance of evidence against them as to make it the duty of the judge, if requested, to direct a verdict negativing such facts. In other words, it must be assumed that the jury would have found every fact in favor of the plaintiff that the testimony given made it the duty of the judge to submit to their consideration. The testimony was sufficient

for this purpose, as to the making of the representations by the defendant, as claimed by the plaintiff, and, also, that such representations were in fact false. As to the former, no discussion of the evidence is necessary. As to the latter, the evidence tended to show that all the real estate in which Kahn had any interest was encumbered to its whole value. That the debts owing by him, not a lien upon any real estate, considerably exceeded any tangible personal property in his possession, and also any demands of his against solvent persons. This was sufficient to require the judge to submit the question as to his solvency to the jury. The real question in the case is, whether the evidence warranted the submission of the question whether the representations were fraudulently made by the defendant with intent to deceive the plaintiff. The counsel for the appellant does not question but that, to entitle the plaintiff to recover, he must show that the representations were known to be untrue by the defendant at the time he made them, or that he assumed to have knowledge of their truth, knowing that he had no such knowledge. In either event a design to deceive the plaintiff would be fairly imputable to the defendant, for in either he uttered a conscious falsehood to the plaintiff; in the former, by stating what he positively knew to be false, and in the latter, by stating that he knew certain facts of the truth of which he knew nothing. It is not claimed by the appellant that there was any testimony given showing that the defendant knew or believed that Kahn was insolvent when he made the representations, nor but that he at the time believed him to be a man of means and a safe person to sell goods to upon credit. The latter ground is relied upon by the counsel of the appellant as sustaining the ruling of the judge. In examining this ground, it is necessary to see precisely what the representations were, and the circumstances under which they were made upon these points. The testimony upon the part of the plaintiff is very brief, and is that of the plaintiff himself. He testified that he was in Syracuse and Kahn wanted to buy some sheep skins of him, and wanted four

months time; that he went to the store of the defendant, where he found him and two or three others standing by the stove; that he said to the defendant, I want to speak a word with you; he said, certainly, and we went into his counting room; I said, Falker I want to ask you a question; Kahn wants to buy some skins of me on time, and I want to know if he is responsible; he, the defendant, said Kahn was perfectly good, good for $17,000 or $18,000 in property in Syracuse, and if I took Kahn's note he would discount it for me and see that it was paid. That thereupon he sold Kahn $180 worth of skins and took his note therefor at four months. If this is to be regarded as a statement by the defendant that he had acquired by some means an intimate personal knowledge of the pecuniary standing of Kahn, and that from personal knowledge of his affairs he knew he was worth $17,000 or $18,000, the proof showing that he was not worth that or any other sum, would show presumptively that he was guilty of an intentional falsehood, designing thereby to deceive and defraud the plaintiff, and would be sufficient in this respect to sustain the plaintiff's case. Story in his Commentary upon Equity, vol. 1, sec. 193, lays down the rule as follows: Whether the party misrepresenting a fact knew it to be false, or made the assertion without knowing whether it were true or false is wholly immaterial; for the affirmation of what one does not know or believe to be true is equally in morals and law as unjustifiable as the affirmation of what is known to be positively false. And even if a party innocently misrepresents a fact by mistake it is equally conclusive, for it operates as a surprise and imposition upon the other party. As to that portion contained in the first paragraph, qualified as it is, that the statement must be such as the party does not know or believe to be true, it may be said that such has been the rule as recognized in all the cases involving the question. It is but a statement in other language, that the representation must be known to be false and made with intent to deceive. The portion contained in the latter paragraph is subject to criticism. If, by it, it is meant that a party is in all

cases responsible for the truth of statements made by him in the belief of their truth, although led into a mistake in regard thereto innocently, it is unsound. It disregards the very ground upon which the liability is based. That ground is fraud. It is impossible to impute fraud when the statement is made in the honest belief of its truth, when such belief has resulted from a mistake fallen into without fault. True, the injury to the other party is the same as though the statements had been fraudulently made, but neither damage or fraud singly gives a right of action. That requires the concurrence of both. In the case supposed, the latter is wholly wanting. If its application is confined to cases where, in making the statement, the party assumes to speak from personal knowledge and to state only what he positively knows, he may justly be held *prima facie* responsible for its truth, for the reason that he assumes to know what in fact he does not, and is guilty of falsehood in thus assuming, the falsehood consisting of that assumption irrespective of his belief of the fact itself. But in no case has it been held that a party was liable for fraudulent representations, in the absence of proof that he was guilty of an intentional falsehood in making them. Were not this the rule, a party might be held liable for damages for making fraudulent representations while entirely free from any intention to deceive in any respect. In *Bennett* v. *Judson* (21 N. Y., 238), it was held that a vendor of land was liable for fraudulent statements made by his agent in negotiating the sale in respect to the location and quality of the land irrespective of his belief of the truth of such statement. This was upon the ground, that he assumed to know, and it was proved that he did not; and thus the agent was shown to have been guilty of falsehood in making such statement. The same remarks apply to *Zabriskie* v. *Smith* (3 Kernan, 322), so far as the case involves the point under consideration. See, also, *Craig* v. *Ward* (36 Barb., 378); *Sharp* v. *Mayor of New York* (40 id. 258). The last case I should not incline to approve in all respects without further examination. As before remarked, the plaintiff was entitled to recover, so far as the

point under consideration is concerned, if the defendant is to be understood as speaking of his own personal knowledge of the affairs of Kahn in making the statement. But was the plaintiff authorized so to understand him, and did he so intend to be understood? The plaintiff called upon the defendant, and told him Kahn had applied to him to purchase sheep skins of him upon credit, and wished to know if it would be safe to trust him; to which the defendant replied, in substance, entirely; and that Kahn had $17,000, or $18,000 of property in Syracuse. Notwithstanding the positive form of the reply, I think that the fair presumption is, that the defendant intended only to express his firm belief and confident opinion, that such was the pecuniary situation of Kahn; and that he would be so understood, not only by business men in general, but that he was in fact so understood by the plaintiff. This construction was put by the court upon much stronger representations in *Haycraft* v. *Creasy* (2 East., 92). I entirely concur in the reasoning of a majority of the court in that case. Applying this construction to the representation, there was no evidence tending to show that they were not honestly made. Kahn was at the time keeping a leather and finding store in the immediate vicinity of the defendant, and had done so for a considerable period. During all this time, he had been in possession of stock to the amount of several thousand dollars. He was in possession of real estate, to some of which at least, he held the legal title to an amount sufficient, with the stock in his store, to make the sum stated by defendant. It was not shown that the defendant had any knowledge of any encumbrances upon the real estate, or of other debts, owing by Kahn. Under these facts, there was not sufficient evidence to go to the jury of any fraud in making the statement. The motion for nonsuit should have been granted. The Supreme Court was right in reversing the judgment, and granting a new trial, and the order appealed from should be affirmed.

WOODRUFF, LOTT and JAMES, JJ., concurred for affirmance. HUNT, Ch. J., and MASON J., were for reversal.

Order of General Term affirmed, and judgment absolute for the defendant.

[MURRAY, J., was prevented by illness from being present at the June term consultations.]

NOTE.—The case of *Chester* v *Comstock*, referred to in the above opinion of DANIELS, J., was submitted January 8th, 1869, and decided by this court March 19th, 1869.

It was an action to recover the amount of a judgment and interest, which the plaintiff had previously obtained against one Stewart, an insolvent. It appeared that the defendant had assigned to the plaintiff a claim he held against Stewart, upon which the plaintiff had recovered the judgment against Stewart, but was unable to collect it. The complaint alleged that the plaintiff had taken the assignment, relying upon representations of the defendant that Stewart was wealthy and abundantly responsible for any judgment that might be recovered against him on such claim, and alleging that the defendant undertook and promised to the plaintiff that Stewart was good and responsible.

Upon the trial, the assignment from the defendant to the plaintiff being in writing, objection was made to any parol proof of the defendant's representations, but it was permitted to be given. It was found by the referee who tried the cause, that the representations were made by the defendant and that they were false, but that there was no evidence that the defendant's intestate knew that they were false, nor tending to show he did not believe all he said touching the responsibility of Stewart, but that the defendant's intestate did not exercise ordinary prudence to ascertain whether his representations to the plaintiff in that respect could be made with truth, and he, therefore, held him liable. The Supreme Court, at General Term, reversed this judgment and ordered a new trial, and the plaintiff appealed to this Court. The order of the General Term was affirmed by the court unanimously, WOODRUFF and LOTT, JJ., writing the opinions.

"Actionable fraud," says WOODRUFF, J., in delivering the opinion, "consisting in a false representation, imports *ex vi termini* an intent to deceive. It may be committed by stating what is known to be false. It may be committed by professing knowledge of the truth of a statement which is untrue. But, in either case, falsehood uttered with intent to deceive, are the essential ingredients."

And then, after showing that nothing in *Bennett* v. *Judson* (21 N. Y., 240), or in *Story*, is not in perfect harmony with this doctrine, the learned judge

Chester v. Comstock.—Note.

says further: "But a representation made without intent to deceive, in the belief that it is true, whether it be a representation importing the existence of the fact, or importing knowledge of the fact, is not *per se* a fraud for which an action will lie. Whatever the representation may be, it is in such actions a question, and a vital question, whether it was fraudulently made; that it was made imprudently or indiscreetly, is not enough. Deceit is the gist of the action. Falsehood, the intent to deceive, and damage must concur. It is sufficient to cite, for a proposition so entirely elementary, *Parsley* v. *Freeman* (3 T. R., 51); *Addington* v. *Allen* (11 Wend., 374)."