THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JAMES J. HINES, Appellant.

Argued June 3, 1940; decided October 8, 1940.

*Martin W. Littleton, Irving Goldberg* and *Richard H. Brown* for appellant.

*Thomas E. Dewey,* District Attorney (*Stanley H. Fuld, Burr F. Coleman* and *Whitman Knapp* of counsel), for respondent.

FINCH, J. After a trial in General Sessions defendant was found guilty by the jury upon all counts of the indictment. Of these the first count charged a conspiracy to contrive, propose and conduct lotteries known as the " numbers game " and " policy," and the remaining twelve counts charged separate substantive crimes, each consisting of taking part in contriving, proposing or drawing a lottery known as the " numbers game " and " policy " in violation of the Penal Law (§ 1372).

Upon appeal to the Appellate Division, that court unanimously affirmed the judgment of conviction.

As the facts found present a background against which the questions of law are to be considered, we note the opening paragraph in the opinion of the Appellate Division: " The concession of appellant's counsel that ' unquestionably, the testimony was sufficient *prima facie* to establish that appellant was a member of the conspiracy to commit the crimes charged, as alleged in the indictment,' renders unnecessary any extended review of the evidence. Indeed, an examination of the record and briefs leads to the conclusion that it would have been futile for counsel otherwise to contend. Questions of law only, therefore, need be considered." (258 App. Div. 466, 467.)

Let us examine what facts the evidence was sufficient to establish, so that counsel for defendant was forced to say " unquestionably the testimony was sufficient  *  *  *." For the purposes of this appeal, therefore, we must assume that the evidence is sufficient to establish the following:

Briefly, in 1931, the notorious Dutch Schultz with a group of associates formed a combination to gain control of and operate various policy enterprises. By 1932 this combination had consolidated these enterprises into a business which operated a daily drawing, except Saturdays and Sundays, clearing an annual income of hundreds of thousands of dollars. Specifically, when the daily net intake had grown to $45,000 by the fall of 1932, the leaders still were not satisfied, and contrived a scheme whereby the profits might be still further increased through a rigging of the pari-mutuel figures on which the pay-offs were based.

Therefore, the combination paid an individual $10,000 a week to manipulate the odds on the last race in such a way as to prevent an honest pay-off when too many players had chosen a legitimate number. As the combination increased and became more centralized, its operations became more vulnerable to attack by honest law enforcement authorities. It became essential to the continued growth and profits to have someone as a member of the gang who could as far as possible furnish protection from arrest and, if arrested, immunity from conviction. Appellant was taken in for this purpose and was paid $500 to $1,000 a week over the period from 1932 to about October, 1936, with a cut in the weekly salary in 1935 to $250 to $500 together with incidentals such as some $30,000 to help elect a District Attorney named by appellant. In brief, the method employed was to obviate arrests by obtaining the transfer to other portions of the city of the police officers who were efficiently performing their duty in enforcing the criminal law, and arranging with magistrates for dismissals when arrests were made. Appellant also took part in opening central headquarters for the combination which under the direction of Dutch Schultz were not to be opened without his approval. He also sought to arrange the removal of the banks of the combination from New York to Mt. Vernon. He took part in selecting and financing the campaign of the successful candidate elected to the office of District Attorney, and thereafter used his influence to prevent serious investigation by such office into his own activities and the activities of those associated with him in the conspiracy. As found by the jury and as stated in the brief of appellant: After he [appellant] was hired, as aforementioned, appellant allegedly used his political influence on behalf of Schultz and his associates whenever called upon to do so. From time to time, various police officers who had molested or threatened to arrest or molest members of the Dutch Schultz gang, were transferred to other precincts, presumably through appellant's efforts or influence. On one occasion, according to Weinberg's testimony, appellant, at Weinberg's request, communicated

with a Magistrate and induced him to dismiss policy charges pending before him against employees of the combination who had been arrested by the police (fols. 2546, 4917). On another occasion, upon a similar request from Davis, appellant allegedly used his influence with another Magistrate for a similar purpose (fol. 4896). Other testimony was introduced tending to show that appellant interceded with other officials, on behalf of Schultz and his associates (fols. 5027–5030).

The work of appellant in preventing arrests and obtaining immunity from conviction was most successful. In order not to lengthen unduly this opinion, it may be said that here was a well-organized business, successful in effective corruption of police and magistrates and in the destruction of public confidence in the orderly processes of justice in a democracy. Facts in detail supporting conclusory statements herein are available in the record.

Are there any questions of law which compel us to nullify the judgment of conviction as supported by the facts as found? Even if technical errors exist, they must be disregarded and the judgment of conviction affirmed unless a substantial right of appellant would be thereby prejudiced. (Code Crim. Proc. § 542.)

We take up the alleged errors seriatim in the order set forth in the brief of appellant.

Appellant contends that the offenses of which he stands convicted, namely, contriving, proposing or drawing a lottery, or assisting in contriving, proposing or drawing a lottery, because they relate to policy, are not punishable under the provision of the Penal Law relating to lotteries. In other words, the contention of appellant is that policy is not a lottery.

The answer to this contention is two-fold. The express language of the Penal Law is concededly broad enough to cover policy. (§ 1370.) Second, that policy is a lottery has been so held not only by this court but by the courts of every other jurisdiction which have been called upon to decide the question. As was said in the highest court of

Virginia recently (*Abdella* v. *Commonwealth*, [Va. 1939] 5 S. E. Rep. [2d] 495): " that it [policy] is a lottery is nowhere questioned."

A lottery is defined in section 1370 of the Penal Law as follows: " A scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise or by some other name."

This is general language comprising every form of lottery of which there have been many forms in the past and will be many forms in the future. Every year human ingenuity is expended in inventing a new form, but in each the fundamental principle is the same, namely, a scheme for the distribution of property in which a valuable consideration is paid on chance alone, with no admixture of skill. It cannot be successfully contended that there arises a need to draw a new statute every time a new device arises for the creation of a lottery. Every scheme for a distribution of property by chance among those who have paid a valuable consideration, is covered by the comprehensive definition in section 1370 of the Penal Law. In the language of the definition of a lottery in the Penal Law there is no reference to specific property. Money is property, and " the language of section 1370 of the Penal Law and its predecessor has received the broadest interpretation. The sale of a piece of chewing gum for a penny, which secured a chance to draw a prize in value according to the number on the package constitutes a lottery * * *." (*People* v. *Miller*, 271 N. Y. 44, 47.) Policy is merely another form of such a scheme. Policy as conducted by the combination was a scheme of chance in which the player selected a number containing three figures. That number was written on a slip of paper which was given with the amount bet, to a so-called collector. The winning number was determined each day by chance, generally, in the case at bar, by a computation based upon the moneys paid on the result of horse races at a designated track, subject to the rigging of the last number as above noted. If a player succeeded

in picking the winning number, he was paid six hundred times the amount of the bet, otherwise nothing. That such a scheme falls within the above quoted definition of a lottery, finds support if support be needed, in the decision of the courts of this State (*Wilkinson* v. *Gill*, 74 N. Y. 63), and of the courts of every other jurisdiction that has considered whether policy is a lottery. (*Forte* v. *United States*, [Ct. of App. Dist. Col. 1936] 83 Fed. Rep. [2d] 612; *Reilley* v. *United States*, [C. C. A. 6th Cir. 1901] 106 Fed. Rep. 896; revd., *sub nom. Francis* v. *United States*, on other grounds, [1903] 188 U. S. 375; *Thomas* v. *State*, [1903] 118 Ga. 774; *State ex rel. Kellogg* v. *Kansas Mercantile Assn.*, [1891] 45 Kan. 351; *Commonwealth* v. *Sullivan*, [1888] 146 Mass. 142; *Commonwealth* v. *Wright*, [1884] 137 Mass. 250; *People* v. *Hess*, [1891] 85 Mich. 128; *People* v. *Elliott*, [1889] 74 Mich. 264; *State* v. *Hilton*, [1913] 248 Mo. 522; *State* v. *Harmon*, [1894] 60 Mo. App. 48; *State* v. *Martin*, [1896] 68 N. H. 463; *Dombrowski* v. *State*, [1933] 111 N. J. L. 546; *Commonwealth* v. *Chirico*, [1935] 117 Pa. Super. Ct. 199; *Commonwealth* v. *Banks*, [1930] 98 Pa. Super. Ct. 432; *Abdella* v. *Commonwealth*, [Va. 1939] 5 S. E. Rep. [2d] 495.)

*Wilkinson* v. *Gill* (74 N. Y. 63) was a civil action for the recovery of a penalty under a statute permitting such recovery by " any person who shall purchase * * * ticket * * * in any portion of any illegal lottery " (now Penal Law, § 1383). The trial court charged as a matter of law that playing " policy " was the purchase of an interest in a lottery, and this court, in affirming, held that " policy " did constitute a lottery. The provision of the Revised Statutes then under consideration by the court has now been incorporated without substantial change as section 1383 of the Penal Law. That section and section 1372 involved herein, are both parts of the same article of the Penal Law (130). In consequence the meaning of the word " lottery ". as used in each is controlled by the general definition found in the same article (§ 1370). The contention of defendant, that the word " lottery " may have a different meaning in each section

because section 1383 provides a civil remedy and section 1372 a criminal provision, is without merit, for the word " lottery " has the same meaning in each section in accordance with the definition in the same article (130). The opinion in *Wilkinson* v. *Gill* (*supra*) states: " The question is therefore presented, whether the ' policy ' transactions were within the statute. The statute is very broad and comprehensive. * * * " The court then goes on to define the word " lottery " and says: " The word ' lottery ' has no technical legal meaning. It must be construed in the popular sense, and with a view of remedying the mischief intended to be prevented. * * * Worcester defines ' lottery ' as ' a hazard in which sums are ventured for a chance of obtaining a greater value.' The language of FOLGER, J., in [*Hull* v. *Ruggles*] 56 N. Y. 424, may be adopted as a result of the accepted definitions. ' Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out by the public, what and how much he who pays the money is to have for it, that is a lottery ' " (p. 66).

It is submitted that a reading of this opinion confirms a reading of the language of the section itself.

An example or two from the opinions in other States (and in several of them the statute is identical with our own) shows the clear-cut line of reasoning. In *Commonwealth* v. *Wright* (137 Mass. 250, 251) the court in an opinion written by Mr. Justice HOLMES said: " We cannot say, as matter of law, that the facts that the prize was money and not specific, and that more than one could select the same number with the same result, prevented the game from being a lottery. It is a lottery according to the popular use of the word as shown by the dictionaries, according to history, to which lotteries with money prizes not specific have long been known, and according to the course of the decisions."

In another example from the United States courts, where the sole contention of the defendant was that he could not be prosecuted for selling lottery tickets because policy was not a lottery, the court said:

" It is further contended that the numbers game is not a lottery because there must be a physical drawing of the certificate or ticket. One of the essential elements of a lottery is the awarding of a prize by chance, but the exact method adopted for the application of chance to the distribution of prizes is immaterial. * * *

" The policy game is undoubtedly a lottery * * *." (*Forte* v. *United States*, 83 Fed. Rep. [2d] 612, 615.)

It cannot be successfully contended, because the lottery laws were enacted before the game of policy came into being, that, therefore, there may be no prosecution of policy under the lottery statute. Otherwise, as already noted, it would follow that it would be necessary to re-enact over again the same comprehensive statute every time fresh ingenuity invented a scheme to distribute by chance a much greater value in return for the purchase of a chance for an inconsiderable sum.

We reject also the contention that the later enactment of the various provisions of the Penal Law dealing with specific incidents of the game of policy other than the actual running of the game by the insiders, prevents a prosecution of defendant as one of the principal participants. That the little storekeeper who receives a small compensation for permitting his store to be used as a place where a deposit may be made of the slips, or the collector whose only duty is to make collections and carry these slips from the places of deposit to the local or central office, should receive the same punishment as such a principal as the defendant contains an element of unfairness. A consideration of the statutes dealing with the subject and other history shows that, while those who contrived, proposed or drew a lottery, or assisted in so doing, are guilty of a felony under section 1372 of the Penal Law, sections 970 and 974, which do not deal with such activities but define certain of the minor offenses peculiar to policy, provide, in their present form, a lesser penalty for the lesser offense. Section 970 prohibits a person from selling a lottery policy or any paper equivalent thereto. Section 974 prohibits one from keeping an establishment for policy playing, from delivering

or receiving money by playing policy, or possessing policy slips, or other articles used in carrying on policy, or owning or being the agent or janitor of any establishment where lottery policies are sold.

Also the principle is applicable that the State may proceed under a general statute even though a more specific one is available. A specific statute does not necessarily replace a more general statute, and does not become the exclusive method of prosecution. Authorities in this State and elsewhere confirm this principle. In *People* v. *Bord* (243 N. Y. 595) defendant urged that the existence of a specific statute covering the exact act with which he was charged prevented a prosecution for the felony under the more general statute. This court rejected that argument.

In *Wilkinson* v. *Gill* (74 N. Y. 63) it was likewise contended by the defendant that the enactment of laws defining more specifically various phases of policy playing prevented the application of the lottery statutes to policy. In overruling that argument this court said: " It is claimed that the act of 1851 (Chap. 504), is a legislative construction that ' policy ' is not a lottery. This act makes it a criminal offense for selling lottery policies, or any writing in the nature of ' bet, wager, or insurance upon the drawing or drawn numbers of any public or private lottery.' It may be that the defendant was liable under this statute, although in fact no policy or writing of any kind was issued or delivered, but I am at a loss to see upon what principle this act can be held to limit or restrict the meaning of the word lottery in the section under which this action was brought. The particular acts which the defendant may have done in pursuing the lottery business, are perhaps described with more precision than in the section in controversy; but this cannot impair the meaning of the section as it stands. That section is general, but very comprehensive, and although the particular device adopted by the defendant may not then have been practiced, yet if its comprehensive terms embraced it, the subsequent passage of an act making such device criminal cannot affect its provisions." .

Cases from other States and from the United States courts are to the same effect. (*State* v. *Little*, [Mo. 1933] 60 S. W. Rep. [2d] 83; *Goode* v. *United States*, 159 U. S. 663; *Bingham* v. *State*, 44 Okla. Crim. Rep. 258; *People* v. *Singer*, 288 Ill. 113; *Bonahoon* v. *State*, 203 Ind. 51).

The cases cited by defendant, such as *People* v. *Bloom* (248 N. Y. 582) and similar cases, are not in point. These decisions do not deal with the question of whether policy is a lottery. They involve only the problem of whether lotteries other than policy may be prosecuted under section 974, which relates solely to policy. Obviously, since lottery is the general term and policy the specific one, every policy is a lottery; but the converse does not follow, and not every lottery is policy. Consequently these cases are not in point.

Appellant urges as his second objection that the proof fails to establish that appellant assisted in contriving, proposing or drawing a lottery. It is difficult to understand this contention since the jury has found upon ample evidence, and the concession agrees, concerning the membership and participation in the conspiracy by appellant. To support this contention defendant seeks to interpret the words " contrives, proposes or draws a lottery, or assists in contriving, proposing or drawing the same " in so narrow a sense that he insists that it was necessary to prove his direct or physical participation in the actual drawing of the lottery. In so urging defendant ignores the fact that his confederates performed the very acts prohibited by section 1372, and that by virtue of the indispensable aid that he rendered in the commission of these crimes, he is himself a principal under the provisions of the Penal Law (§ 2).

In addition, article 130 of the Penal Law constitutes a comprehensive and integrated plan for the suppression of lotteries. After the definition of a lottery, as heretofore set forth, section 1372 holds those master minds guilty of a felony who contrive the scheme, set it up and conduct the same within this State. The meaning of the words to open, set on foot, carry on, promote, or draw a lottery, is indicated

by the legislative history of this section. Its earliest forerunner was enacted in 1819 (Laws of 1819, ch. 206, § 2): " That no person or persons shall, within this state, open, set on foot, carry on, promote, draw, or make publicly or privately, any lottery * * *." This provision was incorporated as it existed into the Revised Statutes but with minor changes (1 Rev. Stat. p. 665, § 27). The present words first appeared in the draft of the Penal Code prepared by the commissioners chosen for that purpose in 1865, and became a part of the Penal Code (§ 325) in 1881 (Laws of 1881, ch. 676). From this legislative history it would seem a reasonable inference that the verbiage to-day was intended to be synonymous with the words " open, set on foot, carry on, promote [or] draw," found in the earlier statutes. For these master minds the Legislature left the penalty of a felony. For the various accessory incidents of a lottery, the Legislature provided punishment as misdemeanors; as for example the letting of premises for lottery purposes (§ 1381), the keeping of a lottery office (§ 1377), the advertising of lottery (§ 1374), and the selling of lottery tickets (§ 1373).

In urging his contention defendant fails to distinguish between a case where the only connection of a person with a lottery begins and ends with his performance of incidental acts specified in the particular sections above, and a case where such person performs acts in deliberate co-operation with those conducting and managing the lottery enterprise itself. (Cf. *Commonwealth* v. *Harris*, 95 Mass. 534; *State* v. *Wong Took*, 147 Wash. 190.) From the activities of defendant set forth above, it is impossible to see how he could have been more directly connected with the enterprise. Even assuming that appellant did not physically " contrive, propose or draw a lottery," nevertheless those with whom he had confederated and with whom he was acting in concert, to wit, Schultz and his henchmen, were plainly engaged in the physical administration and operation of a lottery. Since some of the members of the combination were engaged in the physical task of drawing and selecting the winning numbers, it follows that the conspiracy neces-

sarily involved the commission of the crimes denounced by section 1372 of the Penal Law. The sole remaining question, therefore, relates to the participation of appellant therein, which would seem to be completely answered by the concession of defendant that the evidence established membership in the conspiracy to commit the crimes charged in the indictment. Defendant was charged and found guilty of the acts of affording protection from arrest and, if arrested, immunity from conviction. Hence, he was an indispensable cog in the inside running of this enterprise, or he was nothing. As the Appellate Division noted, the proof was to the effect that the policy game " could not have been carried on without such protection." To urge that one who provided such protection performs just another incidental act similar to the letting of premises for lottery purposes or the collecting of policy slips and carrying them from one destination to another, is to lose sight of the distinction noted above between the connection with the lottery which begins and ends with the incidental act, and where such act is in deliberate co-operation with those conducting and managing the lottery enterprise itself. In other words, while a person who sells to another $10,000 worth of tickets daily may be guilty of a misdemeanor under section 1373, in selling lottery tickets, he may also be charged with violating section 1372 if the jury finds that he has acted in concert and co-operation with the persons who contrived, proposed or drew the lottery. So in the case at bar appellant could unquestionably have been prosecuted for conspiracy to obstruct justice. But his guilt of that crime would afford him no defense when prosecuted for violating section 1372 in view of the fact that he was a member of the conspiracy to commit the crimes charged in the indictment, and was deliberately acting in concert with those operating and conducting the lottery. Where the line would be drawn between acts which were only incidental and those which were deliberate co-operation with those conducting and managing the lottery enterprise and for the specific purpose of furthering the aims and

objects of that enterprise, would be in each instance a question to be determined in the particular case. The proof of the conscious participation by defendant in the criminal enterprise of the combination, even apart from his concession, conclusively establishes him as a principal in each of the substantive crimes committed in furtherance of the conspiracy. As the violation of section 1372 was a daily activity of the combination, appellant was properly convicted of the crimes charged in the indictment.

Appellant urges as his third point that prejudicial error was committed by the trial court because there was received in evidence the testimony adduced before certain magistrates upon the hearing of certain charges against employees of the combination, and in the alleged submitting to the jury for determination as a question of fact whether the magistrates were right or wrong in dismissing the charges.

As already noted, the evidence is sufficient to establish that the principal function of appellant in the conspiracy was to protect from arrest and prosecution those engaged in the combination, except the small fry, and to enhance its prestige thereby. In general appellant was able to do this by exercising his influence with the Police Department. On three occasions, however, the police arrested important members of the combination, and appellant was forced to use the services of two magistrates to secure immunity from conviction. Davis and Weinberg, both participants in the combination, testified that they had spoken about these three cases to appellant, and that he had each time indicated that they would be thrown out in the Magistrate's Court. There is evidence that the two magistrates agreed to and did conduct hearings in cases brought against members of the combination, and agreed to and did discharge prisoners brought before them in spite of what appears to be conclusive evidence of guilt. The minutes of those proceedings in the Magistrate's Court were introduced by the People upon the present trial. It is urged by defendant that it was error to admit these records upon the ground that they constituted hearsay evidence and thus violated the right of

defendant to be confronted with the witnesses who had testified before the magistrates; and further, that these records at best showed only that the magistrates had erred in dismissing the cases. Neither of these objections is valid. In the first place the records were not introduced to establish the truth of the facts therein. There was no such issue before the jury. It follows that the hearsay rule was not involved. (6 Wigmore on Evidence [3d ed.], § 1766.) The minutes were not introduced for the purpose of showing that the magistrates had committed mere judicial error upon the record alone. On the contrary, the circumstances which the minutes disclosed, namely, the nature of the proof before the magistrates, their alleged disregard of the evidence and the law, their contrasting treatment of the witnesses for the two sides, and in short, their general attitude and demeanor in conducting the proceedings, all were evidence supporting other proof of an outside corrupting influence. From this evidence a jury was to find, and was so instructed by the court, whether the magistrates had dismissed the cases upon the basis of their own judgment or as a result of some outside corrupting influence. Thus the records of the Magistrate's Court constituted an integral and proper part of the proof of the People and the evidence was competent to corroborate the testimony of Davis that appellant had made the agreement with the magistrates. In the case at bar, as already noted, there was ample evidence in this record bearing on whether or not the magistrates were acting pursuant to the agreement which was made with appellant, and, therefore, corroborating the existence of the agreement. In *People* v. *O' Neil* (48 Hun, 36; affd., 109 N. Y. 251) it was held that " * * * from subsequent action the jury has the right to infer the existence of a pre-existing fact. * * * So in the case at bar, for the purpose of showing the previous agreement in reference to the subject-matter of this indictment, the people had a right to show the subsequent action of the defendant and his accomplices, which was consistent with the existence of the previous agreement, and from which

the previous agreement might be inferred * * * "
(p. 41). This court, in approving the introduction of the
subsequent proceedings before the Board of Aldermen,
pointed out: " They threw light upon the prior conduct of
the defendant, and tended to confirm the evidence of the
accomplices, and to show that the defendant's vote on the
thirtieth of August, was in fulfillment of the corrupt agree-
ment charged in the indictment " (p. 265).

So in the present case, the minutes of the hearing tended
to confirm the evidence of the accomplices and to show
that the dismissals were in fulfillment of the corrupt agree-
ment made between appellant and the magistrates.

The next claim of defendant is that the court submitted
to the jury as a question of fact whether the magistrates
were right or wrong in dismissing the charges. The trial
court was most careful to point out that the only importance
of the introduction of these minutes was as they bore on
the guilt of defendant. The court said: " We are not trying
the magistrate; we are trying the defendant. * * * on
the other hand if you assume that the judges, the magistrates
were entirely wrong, not only in their decision, but wilfully
so, if the defendant did not secure that wilful misconduct,
he is not chargeable. The whole thing is whether he
endeavored to influence them and did influence them to
turn those cases out." Again the court said: " Therefore,
as I say, it has that evidentiary value, but you must keep
in mind, after all, the question is whether the defendant
procured or endeavored to procure a wrong decision there
rather than whether the magistrates made it."

We next take up the contention of the appellant that
the first count of the indictment charging a conspiracy is
insufficient upon the face thereof for failure to allege a
complete crime of conspiracy which has not been barred
by the Statute of Limitations. This objection is addressed
solely to the propriety of the conspiracy conviction. As
already set forth, appellant was tried and convicted upon an
indictment containing thirteen counts of which only the
first was for conspiracy, which was a misdemeanor, the

remaining twelve counts each alleging a substantive crime which was a felony. The sentence on the conspiracy count for a misdemeanor was suspended. The sentence of imprisonment was solely upon the felony counts. Even if the indictment had not contained a count for conspiracy, the People would have been entitled to a charge that the jury must decide whether the defendant and others with him had been engaged in a conspiracy and had, pursuant to the scheme, performed acts and aided, abetted or otherwise assisted, in the commission of the felonies charged. In other words, all of the evidence adduced in this case is relevant to, and bears upon the twelve substantive counts charged in the indictment. (*People* v. *Crossman*, 241 N. Y. 138; *People* v. *Luciano*, 277 N. Y. 348.) It follows that any error found in the allegation of the conspiracy count in the indictment furnishes no reason for interfering in any manner with the sentence arising out of the felony counts.

We are brought then to an examination of the conspiracy count which is directed only to the formal sufficiency of that count upon the face thereof and not to the introduction upon the trial of the matter relating to the conspiracy and the participation of appellant therein. This count specifically charges that this conspiracy continued from March, 1931, through January 13, 1937. The indictment was filed May 26, 1938. There is also evidence by at least two witnesses that payment of defendant was continued for seven or eight payments in the year 1936 at the rate of $1,000 a month. Appellant contends that under the provisions of the Penal Law (§ 583) and the Code of Criminal Procedure (§§ 398, 142) this conspiracy count is invalid on its face. The doubt that may have existed at common law has long since been dispelled by the statutory provisions in our laws that except in connection with the commission of certain crimes, not here material, an overt act is an essential ingredient of the crime of conspiracy. (Penal Law, § 583.) Whatever the relative weight of the unlawful agreement and of the overt act as necessary parts of the crime, the latter is a required element. Since no agreement to

commit a crime amounts to a conspiracy unless some act be done to effect the object thereof, the crime is not complete until the doing of the overt act. Thus, the commission of the crime depends for its validity upon the overt act and the unlawful agreement or combination without the overt act is insufficient to constitute the crime. Since an indictment must allege " a plain and concise statement of the act constituting the crime " (Code Crim. Proc. § 275), which has not been barred by the running of the Statute of Limitations, it follows that an indictment for conspiracy must contain an allegation of an overt act within the period of limitations. The crime of conspiracy being a misdemeanor, the applicable period of limitations is two years. (Code Crim. Proc. § 142.) Although the first count alleges some fifteen overt acts, none is alleged within two years of the filing of the indictment. Therefore, regardless of proof of overt acts upon the trial, the defendant was entitled to have the indictment in this count allege a crime for which he could be prosecuted. Unlike a Statute of Limitations in a civil case, such a statute in a criminal case creates a bar to prosecution and the time within which an offense is committed becomes a jurisdictional fact which the State must allege and prove. (1 Wharton on Criminal Evidence [11th ed.], § 198.)

The respondent urges that the Code of Criminal Procedure permits the allegation of an overt act antedating the statutory period of limitation and then giving proof at the trial of any other overt act. (Code Crim. Proc. § 398.) Since there can be no valid basis for a charge of conspiracy unless an overt act be done to effect the object thereof, the law necessarily implies that such an act must be done within the running of the statutory period of limitations. Moreover, under the plain language of the Code of Criminal Procedure (§ 398) a defendant can be convicted upon proof of one or more overt acts alleged in the indictment. Obviously, therefore, at least one of the overt acts alleged in the indictment must be within the period of limitations. Otherwise, if all of the overt acts alleged in the indictment

were already barred by the Statute of Limitations, the crime could not be established except by proof of one or more of those barred acts. Therefore, regardless of the proof of overt acts upon the trial, the first count must be dismissed for insufficiency upon the face thereof and no prosecution and conviction on the conspiracy count may be had when the defendant was not legally indicted for the crime under the applicable statutes. (*Brown* v. *Elliott*, 225 U. S. 392; *Hyde* v. *United States*, 225 U. S. 347, 357; *United States* v. *McElvain*, 272 U. S. 633.)

Lastly, defendant contends that the trial court erred in permitting the testimony of the deceased witness Weinberg to be read in evidence, and in refusing to permit any inquiry into the circumstances of his suicide.

The right to read into evidence the testimony of a witness upon a prior trial who has since died, is governed by the Code of Criminal Procedure (§ 8), which provides in part as follows:

" Rights of defendant in a criminal action.

" In a criminal action the defendant is entitled  *  *  *

" (3) to produce witnesses in his behalf, and to be confronted with the witnesses against him in the presence of the court, except that  *  *  *

" (d) where the defendant has previously been tried upon an indictment or information embracing the same charge, the testimony of any witness who has testified upon such prior trial may be read in evidence upon any subsequent trial of the same indictment or information, upon its being satisfactorily shown to the court that the witness is dead or insane, or cannot with due diligence be found in the state."

During the pendency of the second trial and before being called to the stand, Weinberg, a witness for the People, committed suicide. At the first trial he had been fully and exhaustively cross-examined. During the present trial the prosecution read into the record a transcript of his previous testimony. The contention of defendant is that the above provision of the Code of Criminal Procedure does not apply because the former trial ended in a mistrial.

The fundamental right of a defendant which is preserved here is the right of confrontation — that is, that the defendant shall have a proper opportunity to meet the witness face to face in cross-examination. (*People* v. *Fish*, 125 N. Y. 136, 152; *Mattox* v. *United States*, 156 U. S. 237, 242, 243.) In accordance with the foregoing principle, if this right of cross-examination is complied with, it does not matter how far the proceedings had progressed in the prior trial, nor how that trial was terminated. Thus, the fact that the former trial had resulted in a disagreement of the jury does not render inadmissible the prior testimony. (*People* v. *Penhollow*, 42 Hun, 103.) In dealing with a similar situation in a civil case, where the prior proceeding had never been formally terminated because the referee had died, the court, upon a re-trial, permitted the reading of the testimony and said: " The fundamental ground upon which evidence given by a witness, who afterwards dies, may be read in evidence upon a subsequent trial, is that it was taken in an action or proceeding where the parties against whom it is offered or their privies have had both the right and the opportunity to cross-examine the witness as to the statement offered." (*Young* v. *Valentine*, 177 N. Y. 347, 357.)

Nor do we find merit in the contention of defendant that the alleged refusal of the trial court to permit inquiry into the circumstances of the suicide of Weinberg constituted error. The Code of Criminal Procedure (§ 8) provides that the prior testimony may be read in evidence " upon its being satisfactorily shown to the court that the witness is dead." That is the sole requirement with which we are concerned here, and it was, of course, fully satisfied in this case.

The law is well settled that a deceased witness whose prior testimony is admitted may not be impeached by showing alleged contradictory or inconsistent statements or alleged declarations that the prior testimony was false. (*Hubbard* v. *Briggs*, 31 N. Y. 518, 536, 537; *Stacy* v. *Graham*, 14 N. Y. 492, 498–501; *Mattox* v. *United States*,

156 U. S. 237, 248–250.) The circumstances in the case at bar are well within this rule. Here counsel for appellant desired to present to the jury the circumstances surrounding the death of Weinberg so that the jury might be permitted to speculate upon possible reasons for the suicide and thereby the testimony of the deceased witness might be impugned. In *Motes* v. *United States* (178 U. S. 458), upon which appellant relies, one of the persons who was to be a witness for the government was examined at the preliminary hearing before a United States Commissioner, and at such hearing counsel for the defendant cross-examined the prospective witness. When he was called at the trial, the witness was not to be found although he had been present one hour prior thereto. The question was whether the prosecution could introduce in evidence the preliminary examination of a living witness when it was not shown that his absence was caused by the defendants, that is, whether there had been shown a recognized exception to the rule of confrontation which justified the admission of such evidence. (178 U. S. at pp. 472, 474.) But in the case at bar the ground upon which the evidence has been admitted is the death of the witness, and there is no suggestion that the witness in question is alive. Accordingly, the court in the case at bar had no alternative but to refuse to sanction any attempted impeachment of the deceased witness.

It follows that the judgments should be modified in accordance with this opinion and as so modified affirmed.

LEHMAN, Ch. J., LOUGHRAN, SEARS, LEWIS and CONWAY, JJ., concur; RIPPEY, J., concurs in result.

Judgment accordingly.