THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. SAMUEL B. SMITH, BERNARD CAMEN, ABRAHAM NEWMAN and HYMAN COWEN, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. SAMUEL B. SMITH, ABRAHAM NEWMAN and HYMAN COWEN, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. SAMUEL B. SMITH, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. HERMAN PAUL, NATHAN RABINOWITZ and FRANK RAO, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. NATHAN RABINOWITZ, HERMAN PAUL and JOSE GIL, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. MAX SAL-PETER, HERMAN PAUL and JOSE GIL, Defendants.

County Court, Kings County, July 15, 1949.

*Edward H. Levine, Abraham H. Brodsky, Walter R. Hart* and *Harry Gittelson* for the motions.

*Miles F. McDonald, District Attorney* (*Solomon A. Klein* and *Aaron Nussbaum* of counsel), opposed.

SOBEL, J. These are motions to dismiss six indictments.

All of the defendants have been granted an inspection of the Grand Jury minutes by Judge Leibowitz. And, by further order, *solely on issues of law*, Judge Leibowitz has dismissed some forty counts of these indictments. The defendants contend, on these motions before me, that there is insufficient legal evidence before the Grand Jury to warrant the indictments.

These indictments are the result of a twelve-month Grand Jury investigation into bail-bond practices in Brooklyn. The earlier hearings before the Grand Jury were in the nature of a " John Doe " investigation. Only after the general investigation had been completed did the Grand Jury hear the specific evidence which resulted in these indictments.

To say the very least, the conduct of the " investigation " phase of the hearings, was extremely prejudicial to these defendants. The names of these defendants were mentioned time and time again, in some instances by judges of our criminal courts, in connections entirely irrelevant to the proceedings. And representatives of the State Insurance Department were required to read from their record files every charge, *whether sustained or not,* made against these defendants since they were first licensed as bondsmen. In two instances records of arrests, in matters unrelated in any way to the bail-bond business, were read into the record although the very record disclosed that the charges were promptly dismissed in the courts. It is elementary that a previous charge, arrest, or even conviction, is no proof whatsoever of a defendant's guilt of the crime charged and such evidence may not legally be presented to a grand jury.

The only point I make in this connection at this time is that the Grand Jury before hearing any specific evidence against these defendants, received what in the mildest terms can be called a preconceived unfavorable impression of the defendants; and what was equally damaging, a distorted conception of the nature and purpose of the bail-bond business. All of this is quite evident from the reading of the Grand Jury presentment.

In particular, I deeply deplore, in that presentment, the unwarranted and unjustified criticism of the State Insurance Department for performing its duty exactly as the law and good judgment required. That department is solely responsible for

eradicating the most serious evil of the bail-bond business — overcharging. (It is significant that in the hundreds of bail cases investigated by the Grand Jury not one single instance of overcharging was disclosed.)

In general terms, these indictments charge solicitation of business by unlicensed employees of licensed bondsmen.

There is a general misconception and the Grand Jury minutes appear to indicate that this is shared by some judges—that solicitation of business by bondsmen is illegal. It is entirely lawful — just as lawful as solicitation by life insurance agents. And the solicitation under the law may take place in the courthouses, police stations and places of detention.

It is even necessary and desirable that this should be so—under proper regulation. Otherwise the casual offender, the inexperienced offender, the offender charged with minor crimes, would be confined in jail while the professional criminal with his outside contacts, experienced little difficulty in arranging bail. In this court, even after the cases have been examined below, I have found many defendants ignorant of the fact that bail has been fixed by the magistrate, ignorant of the amount of bail fixed and the method and cost of obtaining release on bail. And it is generally the minor or low bail offender, whose even temporary detention is not justified by the crime charged, who finds himself in that predicament. It is most desirable that this class of offender should be solicited and bailed. Unfortunately he is not solicited. He is not solicited because his low bail is unprofitable. (On bonds of $200 or under the law allows a premium of $10— but of this $10 the bondsmen keep only $3 and the surety company received $7.) This is a matter of everyday observation and concern to the conscientious judges of our criminal courts.

The problem of solicitation, like most other problems, is largely economic. Bondsmen are not independent operators. Actually they are subagents of licensed insurers organized under the insurance law, i.e., each bondsman is a subagent of a particular casualty or surety company. In this State, unlike many other States, only insurance companies may engage in the business of giving bail for profit. True, the law, section 554-b of the Code of Criminal Procedure appears to permit any individual or company to engage in that profitable business. Actually, no individual or corporation has ever applied for a license. Perhaps, that is because the Attorney-General has ruled that a *corporation* engaged in the " business of giving bail " must be one entitled to carry on " the business of insurance ". (1927 Atty. Gen. 163.)

More likely, it is because any individual, copartnership or corporation, under that law, would be required to maintain security dollar for dollar for all outstanding bail bonds — an impossible and unnecessary condition. A casualty insurer on the other hand, may engage in the bail-bond business with relatively little additional capital and a surety company with none at all. (See Insurance Law, § 311.) Such insurers may issue an unlimited number and amount of bonds—several millions of dollars for each company are outstanding at all times.

Each insurer engaged in the business of giving bail appoints a general agent for each territory, a city perhaps, more often a State or several States. The general agent supervises all licensed subagents or bondsmen as they are commonly called. Beyond approving the subagent's license, the insurer thereafter never exercises any direct supervision or control over them. They deal exclusively with the general agent. The general agent fixes the overall limitation on the number and amount of bonds each subagent may write. The general agent furnishes all forms and powers to the subagent. It is his duty to collect from the subagent the insurer's share of the premium.

The rates charged by bondsmen are fixed by law (Code Crim. Pro., § 554-b); 5% for the first $1,000, 4% for the second $1,000 and 3% for all bonds over $2,000. There is a minimum premium of $10 permitted for all bonds under $200.

The insurer receives a substantial portion of the premium. Their general rate is 2% of the bond. They also receive $7 of the minimum $10 charge. Thus on a $1,000 bond, the bondsman receives $30 and the insurer $20; on a $2,000 bond, the bondsman receives $50 and the insurer $40; on a $5,000 bond, the bondsman $80, the insurer $100; on a $10,000 bond, the bondsman $130, the insurer $200. Thus while the premium charges are high, the principal beneficiary is the insurer.

There are no losses. *Forfeitures are paid by the subagent.* In Brooklyn at least, for the past several years no insurer has ever had to meet a single forfeiture. To secure itself against even the remote possibility of any loss, the general agent maintains a build-up fund. He deducts from ¼ to ½ of the bondsman's share of each premium to establish a fund from which to meet any forfeiture which may not be paid by the bondsman. These funds reach substantial proportions. Bondsmen are also required to maintain $5,000 bonds for each licensed employee with the Superintendent of Insurance.

The bondsman or subagent on the other hand, has substantial administration expenses. He has many employees. He frequently

maintains several branch offices near local courts. Forfeitures are not infrequent. He must do a large volume of business. He must be selective and avoid poor risks. He must advertise. He must solicit.

Generally speaking, a license from the Insurance Department is necessary before any broker or agent may solicit any kind of insurance. And generally the reason for such licensing requirement is primarily the protection of the public. Most kinds of insurance are competitive, competitive in cost and coverage. Although it is not well understood, there is a substantial difference in cost in life and health and in coverage in casualty, fire, and theft as between the companies. And coverage and protection varies in the several kinds of policies. The public for the most part deals with brokers who are its agents in dealing with the companies and selecting the best policy at the best price. Even when dealing with the company agent, the public must be able to rely on his superior knowledge with respect to the most suitable policy for the kind of protection needed. It is necessary and advisable that such brokers and agents be licensed and their knowledge of insurance tested by suitable examination. But in the case of bail bonds, there is no difference whatsoever in the cost or the nature of the bond. All bail bonds are identical and the cost is fixed by statute. A person charged with crime doesn't care who solicits him so long as he gets out of jail at the earliest opportunity and is not overcharged. He is hardly concerned with the character and responsibility of his bondsman. To that extent, at least, the public interest is not of primary concern in the licensing of bondsmen.

In each of the indictments before me, it is charged that certain of these licensed subagents engaged in a conspiracy with one of their employees, who had not obtained a license from the Insurance Department, to solicit bail bonds in violation of section 554-b of the Code of Criminal Procedure and section 331 of the Insurance Law. Each of the unlicensed employees are charged with the substantive crimes of violation of these sections.

In other words the indictments charge that each of the licensed subagents corruptly permitted and encouraged one of their unlicensed employees to solicit bail bonds and by their course of conduct in so doing committed the crime of conspiracy — and their unlicensed employee violated the Criminal Code and the Insurance Law.

The defendants contend that there is insufficient evidence before the Grand Jury to establish " solicitation " by their

unlicensed employees and no evidence whatsoever to establish a conspiracy between the licensed employers and the unlicensed employees.

Section 110 of the Insurance Law is a general provision applicable to all agents of all classes of insurers. It provides that every agent or subagent of an insurance company must be licensed. It also provides that a license need not be obtained for " Any regular salaried officer or employee of any insurer, who devotes substantially all of his services to activities other than the solicitation of insurance business from the insuring public, and who receives for the solicitation of such insurance no commission or other compensation directly dependent upon the amount of business obtained * * *." (Subd. 2, par. [a].)

The same section defines the term " insurance agent " to mean an agent or subagent who acts as such in the solicitation of, negotiation for, or procurement or making of an insurance contract. But the definition excludes from the licensing requirement for agents—" any regular salaried officer or employee * * * of a licensed insurance agent, who does not outside of an office of such insurer or agent solicit or accept from the public applications or orders for any such contract, if such officer or employee does not receive for his services a commission or other compensation directly dependent upon the amount of business done." (Subd. 3.)

In short that statute says that an employee of a licensed agent *may* solicit provided:

(1) substantially all his services are devoted to activities other than solicitation,

(2) the occasional solicitation takes place only in the office of the agent, and

(3) his salary or commission is not contingent upon the amount of business done.

Originally each indictment contained counts charging violation of section 110 of the Insurance Law but these counts were dismissed by another judge of this court. This section is in my opinion, however, pertinent to an understanding of the general scheme of licensing agents and their employees.

Specifically bondsmen are covered by the provisions of section 554-b of the Code of Criminal Procedure first enacted into law in 1922 (L. 1922, ch. 303), and section 331 of the Insurance Law added in 1939 (L. 1939, ch. 882) to the recodification of that law which was effected in that year by a legislative commission.

Bail originally was personal. It was required that sureties must be freeholders and the bailed person was released in their

personal custody. It is only in comparatively recent years that the statutes have allowed bail by corporations or insurers. As late as 1901 (1901 Atty. Gen. 257) the Superintendent of Insurance asked the Attorney-General whether an insurer could issue bail bonds. And not until 1913 was all doubt on that subject removed by the enactment of now section 327 of the Insurance Law.

Section 554-b of the Code of Criminal Procedure does not in express terms make it a criminal act for an unlicensed agent or employee of a professional bondsman to solicit bonds. That section was added in 1922. There is little doubt that it was originally intended to bring under the supervision and regulation of the Insurance Department those individuals and corporations, *not licensed insurers,* who were at the time freely engaged in furnishing bail for profit without restriction as to charges and without proper investigation as to their responsibility.

It defined as " professional bondsmen " those persons or companies which wrote more than two bonds a month for compensation.

Subdivision 2 authorized the courts to examine into the indemnity exacted by bondsmen and into the fees charged.

Subdivision 3 required every professional bondsman to obtain a license from the Insurance Department " in accordance with said insurance law ".

The material provision is contained in subdivision 4. That subdivision imposes a duty upon each *insurer* operating in a city of the first class to obtain a license for each of its agents and subagents soliciting business. It is important to note that no duty is imposed on the *subagent* to obtain such license. In 1933, following the opinion of the Attorney-General (1927 Atty. Gen. 163) (that a corporation writing bail bonds must be one authorized to do an insurance business), subdivision 4 was amended (L. 1933, ch. 315) on the recommendation of the Insurance Department. The department memorandum states that the purpose of the amendment was to require surety or casualty companies to obtain separate licenses for their agents or subagents to solicit bail bonds in addition to the license required to solicit other lines of insurance. The words " Such license shall be in addition to any certificate of authority required by the insurance law " were added. But in accomplishing that purpose, the subdivision which prior to that time was never intended to apply to insurers but only to " professional bondsmen ", was made applicable only to insurers. The changes made were as follows :—

" Every *insurance* corporation *or other insurer* engaging in the business of giving bail * * * shall procure a license for each of its employees, officers *and agents* acting for it *or soliciting such business for it* and shall file * * * certified statements of the names of all persons authorized to execute bail bonds in its behalf *or solicit such business as agents.* Such license *shall be in addition to any certificate of authority required by the insurance law and* may be issued only by the superintendent of insurance. Every *insurance* corporation *or other insurer* engaging in such business of giving bail, *and each employee officer or agent so required to be licensed* shall * * *." (L. 1933, ch. 315.) (New matter underscored.)

Since that amendment all agents and subagents of insurers have been required to obtain licenses pursuant to section 554-b of the Code of Criminal Procedure and also section 115 of the Insurance Law. Thus this section of the Code by amendment and subsequent construction and acceptance has been held applicable to agents and subagents of licensed insurers although there is no doubt that it was originally applicable to " professional bondsmen " other than licensed insurers.

Subdivision 5 fixes the maximum premiums which may be charged. It also contains the penal provisions of the section. (Violation of the provisions of the Code of Criminal Procedure is not a crime unless so expressly stated.) What does subdivision 5 make a crime? It makes overcharging or accepting a fee from a defendant for obtaining a bondsman a crime. It also provides that any person or corporation—" *who shall act in such business as aforesaid without obtaining a license* * * * shall be guilty of a misdemeanor ". The penal provision underscored has not been amended or changed in any respect since its original enactment. A careful reading of section 554-b as it was enacted in 1922 (L. 1922, ch. 303), makes perfectly clear the legislative intent. No " person or corporation * * * shall act in such business as aforesaid without obtaining a license ", refers to a " professional bondsman " engaging " in the business of giving bail ". It does not refer to the licensing of employees of subagents who solicit business. In fact no mention was made of " soliciting " in the statute until the amendment of 1933. Further even under that amendment, there is no express prohibition against soliciting by either agents or subagents or their employees. *Subdivision 4 merely imposes a duty upon an insurer to obtain a license for all agents or subagents or employees who solicit bonds.* By no possible construction can that subdivision be

interpreted to prohibit solicitation by unlicensed employees of subagents. A clear and positive expression of the legislative intent is necessary to make an act criminal. The acts made criminal must be stated in express positive terms. They cannot be made criminal by implication.

It is urged by the District Attorney that the unlicensed employees may be deemed " professional bondsmen " as defined in subdivision 1 of section 554-b. By no stretch of construction is that possible. They do not " deposit money or property as bail ". They do not " execute as surety any bail bond ". The bonds are executed by the officers of the insurer. They are turned over as executed powers by the general agent to the subagent. The subagent prepares the application for signature by the prisoner or the applicant for bail on his behalf. The subagent swears to the contents of the affidavits. He affixes the signed powers and together these become the bail bond when approved by the Judge. The unlicensed employee merely brings or directs the applicant to the subagent. He is not authorized to sign any papers or to credit any powers. Further, on the facts, there is no evidence before the Grand Jury that any unlicensed employee for compensation ever " executed " two bail bonds in any one month. It seems clear that under my construction only the insurer can be deemed to be a " professional bondsman " under the definition in the statute.

We turn now to section 331 of the Insurance Law. That section was enacted in 1939. (L. 1939, ch. 882). It was incorporated in the recodification of the Insurance Law on recommendation of the State Insurance Department. Neither the reports of the Legislative commission or the department are helpful in its interpretation. A note merely advises that it was deemed desirable to incorporate provisions with reference to bail bondsmen now in the Criminal Code into the Insurance Law. Whatever may have been the intent, this section is much broader in its scope and coverage than the section of the Code.

Subdivision 1 is merely a restatement of the definition of a professional bondsman as contained in the Criminal Code.

Subdivision 2 provides as follows: " No person, firm or corporation shall in this state do business as a professional bondsman, or shall act as an officer, employee, agent or solicitor of a professional bondsman, and no person, firm or corporation shall for compensation act as solicitor or broker, in soliciting, negotiating or effectuating any such deposit or bail bond by any professional bondsman, unless authorized so to do by a license issued and in force pursuant to the provisions of this section * * *."

The following paragraph (in part) was added by chapter 667 of the Laws of 1946. This was a department recommendation purposing to set up written examinations for licensing.

" The superintendent shall in order to determine the trustworthiness and competency of each applicant for a license *as a professional* bondsman * * * and of each *proposed sublicensee to act as a professional bondsman* require * * *." (Italic supplied.)

This latter paragraph adds to the confusion with respect to the definition of a " professional bondsman ". By practice and construction, the words " professional bondsman " have always been interpreted to refer to the licensed insurer. But in the 1946 amendment, a sublicensee is also referred to as a professional bondsman indicating at least a present intention to regard the insurer and the sublicensee as professional bondsmen.

A loose reading of subdivision 2 would seem to indicate that every officer and employee of a professional bondsman is required to obtain a license. That is not the practice. Officers and employees of insurers who carry a bail-bond line are not required to obtain licenses under the Insurance Law or the Code. The department assures me that it was never their intention to require licenses of bookkeepers, clerks, stenographers or investigators of subagents.

It seems to me that the test is in the provision—

" No person * * * shall for compensation act as solicitor, or broker, in soliciting, negotiating or effectuating any * * * bail bond by any professional bondsman, unless authorized so to do by a license * * *."

It is my conclusion, on the basis of this provision, that it is unlawful by virtue of section 331 of the Insurance Law for an unlicensed employee of a licensed subagent for compensation to solicit, negotiate or effectuate any bail bond.

It is not necessary or possible in this opinion to define the exact limits of the terms " solicit, negotiate or effectuate ". It depends on the facts in each case. I can only examine the Grand Jury minutes with respect to each substantive count of the indictment and make my decision accordingly.

In each case I have considered whether the alleged solicitation took place outside or inside the office of the licensed agent, the previous relationship between the parties and the conversation between the parties. In no case do the Grand Jury minutes establish that the unlicensed employee received compensation contingent or otherwise. The minutes are barren of all proof in

that regard. The District Attorney, in this connection, urges that compensation may be inferred from the course of conduct and relationship between the parties.

On indictment 1996 — 1947, I find that the Grand Jury minutes fail to establish any act of solicitation, effectuation or negotiation of any bail bond by the unlicensed employee, Samuel B. Smith. All of the remaining substantive counts numbered 3, 5, 7, 9, 11, 13, 14 and 22 are dismissed.

On indictment 2009 — 1947, I find that the Grand Jury minutes fail to establish any act of solicitation, effectuation or negotiation of any bail bond by the unlicensed employee, Samuel B. Smith. All of the remaining substantive counts numbered 5, 6, 7, and 8 are dismissed.

On indictment 2010—1947, I find that the Grand Jury minutes fail to establish any act of solicitation, effectuation or negotiation of any bail bond by the unlicensed employee, Samuel B. Smith. All of the remaining substantive counts 2 and 3 are dismissed. The conspiracy count having heretofore been dismissed, the entire indictment is dismissed.

On indictment 1955 — 1947, I find that the indictment fails to establish any act of solicitation, effectuation or negotiation of any bail bond by the unlicensed employee Frank Rao. All of the remaining substantive counts numbered 2, 3, and 4 are dismissed. There was evidence before the Grand Jury that the defendant Rao, by means of printed cards and telephone listing in February of 1946, held himself out as a bail-bond agent and thus solicited a bail bond in behalf of one William Hussey but the Grand Jury failed to indict him for this act.

On indictment 1892 — 1947, I find that the Grand Jury minutes establish that the unlicensed employee Jose Gil, solicited bail bonds on behalf of one James Sheets and one Joseph Calero. There was no evidence before the Grand Jury to establish any other act of solicitation, effectuation or negotiation of any other bail bonds as charged in the indictment. The substantive counts 3 and 35 are sustained. The substantive counts 2 and 34 are dismissed as a matter of law since they charge violation of section 110 of the Insurance Law. All of the remaining substantive counts numbered 4, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32 and 33 are dismissed.

On indictment 1951 — 1947, I find that the Grand Jury minutes established that the unlicensed employee Jose Gil, solicited a bail bond from a defendant, Raymond Montalvo. Substantive count No. 11 is sustained. Substantive count No. 4 is dismissed on the

law with respect to the case of Frank Montalvo since it charges a violation of section 554-b of the Code of Criminal Procedure. Substantive counts Nos. 2, 8, 10 and 12 are dismissed on the law since they charge a violation of section 110 of the Insurance Law. Substantive counts Nos. 2, 3, 4, 8, 9, 10, 12 and 13 are dismissed on the further ground that there was insufficient evidence presented to the Grand Jury to sustain these counts.

Each of the remaining five indictments contain a conspiracy count. It is charged in each indictment that the licensed bondsmen engaged in a corrupt agreement in each instance with their unlicensed employee for that employee to solicit business in violation of law.

The statute involved is subdivision 1 of section 580 of the Penal Law—" If two or more persons conspire: 1. To commit a crime; * * * Each of them is guilty of a misdemeanor."

Under the statute, there must be evidence before the Grand Jury to establish a corrupt agreement plus an overt act. The corrupt agreement may be established by direct proof or by inference as a deduction from acts or conduct which disclose a common design to act together to commit the crime, but, in all events, an actual criminal or wrongful purpose must accompany the agreement. (*People* v. *Flack,* 125 N. Y. 324.)

No agreement amounts to a conspiracy "unless some act beside such agreement be done to effect the object thereof, by one or more of the parties to such agreement ". (Penal Law, § 583.)

The overt act may be that of only one of the conspirators and need not itself be a crime but it must be done with the ultimate objective of committing the crime. (*People* v. *Hines,* 284 N. Y. 93; *Bannon* v. *United States,* 156 U. S. 464.)

**In the indictments** involving the unlicensed employee, Samuel B. Smith, the evidence discloses that the licensed agents rented part of premises at 409 Sumner Avenue, Brooklyn, from Smith. Smith was the owner of the building and also shared the office acting as a business broker. The same premises were shared by other tenants. Each advertised its own business by appropriate signs. The premises were thus occupied for a period of four years. Smith answered all inquiries concerning bail bonds and in each instance referred the applicant to the licensed agent. On some occasions Smith collected the premium; on others it was paid to the licensed agent at the main office. There is no proof before the Grand Jury of any arrangement or agreement between Smith and the licensed agents although in their memorandum submitted on the motion they state he was paid a weekly salary

in addition to the rental. I find that there is no evidence establishing a corrupt agreement between the parties nor has there been proved any acts or conduct from which such an agreement may be inferred. Further I find that none of the overt acts alleged in the indictments have been proved. For these reasons, I am dismissing the remaining counts in indictments 1996 and 2009 of 1947.

Without detailing the evidence before the Grand Jury on indictment No. 1955 of 1947, I find that there is no evidence establishing a corrupt agreement between the parties, nor has there been proved any acts or conduct from which such an agreement may be inferred. I find that none of the overt acts have been proved. I find further that alleged overt acts 1, 2, 3, 4 and 7 have been outlawed by the Statute of Limitations (*People* v. *Hines,* 284 N. Y. 93, *supra*). The indictment is dismissed.

Without detailing the voluminous evidence in indictments 1892 and 1951 of 1947, I find that there is no proof whatsoever of any corrupt agreement between the defendants nor has there been proved any acts or conduct from which such an agreement may be inferred. It has been established that on three occasions of many the defendant Gil solicited bail bonds in violation of section 331 of the Insurance Law. For the most part his activities accomplished lawful ends by lawful means. None of the unlawful acts of the defendant Gil may be considered as evidence in the conspiracy count unless by direct evidence or by inference a corrupt or unlawful agreement between the parties is established. That would follow even if the evidence established that the licensed defendants knew that the defendant Gil was soliciting — which it does not. Mere knowledge of the commission of a crime is not enough. There must be a concurrence in the common design. (*People ex. rel. Hockey* v. *Kearney,* 265 App. Div. 861.) The conspiracy counts are hereby dismissed. Submit appropriate orders with respect to all indictments.