A. Augustus Low, Individually and as Administrator with the Will Annexed of Abbott A. Low, Deceased, et al., Claimants, *v.* State of New York, Defendant. (Claim No. 30361.)

Court of Claims, April 2, 1952.

*Francis C. Steates* and *J. Theodore Cross* for claimants.

*Nathaniel L. Goldstein, Attorney-General (Douglas L. Manley* of counsel), for defendant.

GORMAN, J.  About 1903, Abbott A. Low built a dam across the Bog River in Adirondack Park, St. Lawrence County, near the Hamilton County line.  Some 3,000 acres of wild forest land were flooded including a small swamp area which the State of of New York claimed as part of its forest preserve.  In 1905, after an investigation by the Superintendent of State Forests, Mr. Low was told to lower the water in his dam and that he would be held liable " for damages, already inflicted, as fixed by law, as well as for any subsequent damages " for any timber destroyed by the flooding.  Mr. Low opened his dam gates and lowered the water level at this time.  On July 3, 1908, he was informed in writing that his impounded waters were flooding State lands and " unless immediate settlement is made an action will be begun to enforce the penalties prescribed by law."  The penalty for the killing of each tree was set forth to be $10 and Low was informed that he would be held to strict accountability for his acts.  As a result of these representations, Low paid, as a penalty, to the State of New York, the sum of $7,000.

Neither Abbott A. Low, during his lifetime, nor his executrix, Marian Low, during her lifetime, until her death in 1928, had any suspicion that the State was not the owner of the lands in question.  After her death there was no representative of Low's estate until his son, A. Augustus Low, was appointed administrator *c. t. a.* June 30, 1950.  The first intimation to any one associated with the Low family that the State's representation of ownership was questionable came to Low, Jr. in 1930 through a casual conversation.  He promptly started an investigation and began negotiations with the State in an effort to ascertain the true fact.  He acquired certain property rights and by reason of information and material taken in great part

from official records and State documents contended that because of errors and conflicts in certain ancient surveys the State did not own the land between the St. Lawrence County line and the so-called "Brodhead Line", which was part of a parcel known as the "triangle north of Township 38", Totten and Crossfield's Purchase. He contended moreover that, by reason of those survey errors and consequent defects in certain conveyances to the State, the State also had no interest or title in a strip of land along the north line of Township 38. He asserted that the deeds of 1896 and 1898, purporting to convey the triangle north of Township 38 and the contiguous parcel in the township, were ineffective to convey the lands between the erroneous "Richards line" and the "Campbell" or "true line" bounding the township on the north. He called attention to the illegality of the tax deed of November 27, 1903, as based upon a cancelled sale and to the tax deed of October 17, 1907, where it appeared that the lands were not exposed to sale. He proposed to amicably resolve all these questions by personally acquiring and conveying to the State, title to the lands involved, in return only for the right to flood about 160 acres of the land to be conveyed. Although these negotiations covered a period of approximately nine years, no settlement was reached, and in August of 1939, Mr. Low began the first of three title actions in the Supreme Court to determine the controversies. As a result of these adjudications, all of the contentions of the claimant as to the correct boundary lines and title were upheld. A final judgment in the partition action which was the initial action, tried in August of 1939, was entered on May 8, 1950, and A. Augustus Low was appointed administrator of his father's estate on June 30, 1950. The original claim in the present action was filed on July 6, 1950, and was amended on October 18, 1950.

In 1772, Archibald Campbell and one Stansborough surveyed and marked from its western terminus easterly, the north boundary line of the Totten and Crossfield's Purchase and divided it into townships. A copy of this division was made and filed in the office of the Secretary of State.

In 1797, Charles Brodhead, at the direction of the Surveyor General, attempted to locate the Campbell line, and unable to follow the markings of the Campbell line, at a point some distance easterly of the point where the westerly line of the triangle north of Township 38 intersects the Campbell line, he veered to the south and proceeded along such erroneous line easterly across the triangle.

In 1821, John Richards was directed to allot various townships including the triangle north of Township 38. In so doing he used the erroneous Brodhead line, believing and stating it to be the Campbell line and superimposed a second triangle upon a portion of the original true triangle. A plat of the triangle plotted by Richards was filed in the office of the Secretary of State as Map No. 604. Although the State by thus mistakenly surveying lands it had granted could not thereby alter the location of what it had patented, much of the tenacity displayed by the State in its later vulnerable representations, emanated from this erroneous survey. All of the flooding, except such as took place on the land partitioned to Low in the first action, took place on the area between the Brodhead and the Campbell lines.

The Campbell north line of 1772, the Brodhead erroneous line of 1797, and the Richards erroneous line of 1821, marked by him from the Brodhead line as the south line of the triangle north of Township 38, were identified upon the ground and recognized as to their source by various surveyors at various times thereafter.

In 1854, S. H. Snell found these marked lines upon the ground. He identified them and recognized which were correct and which were erroneous. A copy of Snell's field notes which perpetuated his work, was made by him for the State under the direction of Verplank Colvin, Superintendent of the Adirondack Lands Survey. In 1891, D. C. Wood identified these various lines, recognized which were correct and which were erroneous, identically with Snell, and so recorded them in his field notes, referring to the Brodhead line as the " erroneous county line " and to the Campbell line as the " county line ".

In 1894, D. C.Wood prepared a description which was incorporated in the deed from Webb to Ne-ha-sa-ne Park Association of 1894. Two years later he prepared the description to be used in the deed from Webb and Ne-ha-sa-ne Park Association to the State and the State engineer's office checked and verified this description and the acreage. It is apparent from the reduction in acreage in the descriptions of these conveyances that some of the land surveyed by Wood as part of the triangle and incorporated in the 1894 deed was eliminated from the 1896 deed. The eliminated acreage consisted of the land between the Brodhead and Campbell lines and was part of the flooded area. The map entitled " Map of Lands in Herkimer & Hamilton Counties sold to the State of New York by W. S. Webb & Ne-ha-sa-ne Park Ass'n. Dec. 1895, D. C. Wood, Surveyor " was filed in the office of the Secretary of State — 339-A. In 1896, immediately

upon completion of the Webb purchase, the Conservation Department in its annual report, published a list of the lands acquired from Webb and it listed the Richards lots, lot by lot, acreage by acreage, and omitted the unallotted area between the Brodhead and Campbell lines. In 1896, the Comptroller added these same lands with the same descriptions to his State lands list and in the same year the State engineer and surveyor likewise reviewed and reported these lots and these acreages to the Legislature.

In 1897, Verplank Colvin included in his annual report to the Legislature which was published and circulated, discussions as to this " great boundary line ". In 1898, Verplank Colvin sent Lorrin Kelly to make a study of these lines upon the ground. Kelly's work was perpetuated and a map was made and printed showing the existing area between the two lines.

In 1901, Herkimer County assessed the area between the Brodhead and the Campbell lines to the State, levied a tax and forwarded its list of taxes to the State Comptroller. The State Comptroller verified that these lands were not claimed by the State, and that that they were not on the State lands lists. The Comptroller sent his own surveyor, Clark, to make a survey of the gore. Clark made his survey, placed it on a map and that map was filed in the Comptroller's office. Then Wood Brothers made a map for Herkimer County showing this unallotted area and a copy was filed in the Conservation Department and with the Comptroller. The Comptroller then rejected these taxes as assessed upon lands not on the State lands lists.

Just prior to the county line survey of 1902–1904, the Attorney-General rendered his opinion recognizing the Brodhead line as erroneous, and in 1904, the County of Herkimer again assessed this area and again the taxes were rejected by the State.

The discrepancy between the true line and the erroneous line was further recognized by Deputy New York State Engineer Flanagan and by D. C. Wood, surveying for the State engineer's office in 1902 and 1903, and the State engineer and surveyor made note of it in his survey of the county line of 1904.

On May 23, 1905, the State Superintendent of Forests directed Robert Moore to make a thorough investigation of the flooding. There is nothing to indicate that the investigation on the part of the State was not thorough. It would seem on this record, that a careful examination of its own records would have afforded realization that these were not State lands. Certainly a fair and reasonable study of the records, surveys, titles and

boundaries, available and in the State's possession should have raised a doubt in the minds of ordinarily prudent men both as to ownership and as to location. The State gave no apparent effect to any of this information in making its representation of ownership to Low, Sr., some three years later. It has continued to stand upon its categorical conclusion since. A. Augustus Low developed and learned of these various facts at various times from about 1930 down to and including the time of the trial of the action of *Low* v. *People* (195 Misc. 947). Had the State decided that it did not own the lands, it could legally have accepted Low's original proposition and the case would not be here. The Campbell line had been approved and the Brodhead line entirely discredited by the courts prior to 1930. (*Low* v. *Webb,* 268 App. Div. 104.)

When the State of New York penalized Abbott A. Low the sum of $7,000 for destroying timber by the flooding of lands under the latter provisions of section 222 of the Forest, Fish and Game Act (L. 1900, ch. 20) its right to proceed under the statute was predicated upon its ownership of the land in question. If it did not own the land, it had no authority to levy the penalty and no moral or legal right to retain the money. Unless the State was the owner and the sole owner of the land that was flooded, the statutory provisions of section 221 of the same act required the State to either bring an action in partition if it was an owner of an undivided portion, or bring an action in a court of competent jurisdiction in which questions of title could be litigated if it thought it had an interest. Such litigation would have been between different parties than the parties to this claim. The State elected to hold Low, Sr. to strict accountability for acts constituting a misdemeanor. It is now evident that the State has in its possession a sum of money which it should never have collected and which should be repaid unless the running of the Statute of Limitations shall have extinguished claimant's remedy. A penal statute is to be strictly construed. (*People* v. *Long Is. R. R. Co.,* 149 App. Div. 765, affd. 208 N. Y. 541.) The State was chargeable with knowledge that statutory provisions for penalties must be strictly construed. (*Osborne* v. *International Ry. Co.,* 226 N. Y. 421, 426.)

The basis upon which the money was exacted from Low, Sr. was the material representation to him, which he accepted as true, and upon which he relied, that this thirty acres of bog land belonged to the State; that it was State land. It was only if that had been true that the State would have been able to proceed, under the latter part of section 222 of the above statute and

assess the penalty of $10 a tree. This representation was false. Whether it constituted actual fraud is the real question in this case.

Actual fraud, express or implied, serves to toll the Statute of Limitations until the discovery of the facts which constitute the fraud. (Civ. Prac. Act, § 48, subd. 5; *Nasaba Corp.* v. *Harfred Realty Corp.*, 287 N. Y. 290; *Hearn 45 St. Corp.* v. *Jano*, 283 N. Y. 139.) The essential allegations of fraud have been generally stated as representation, falsity, scienter, deception and injury, but there is no categorical definition of what constitutes a fraudulent concealment sufficient to toll the statute. Each case must be determined upon its own facts and the concealment must be of the cause of action or the facts constituting it. " ' Independent of any statute, form of action or legal nomenclature, the obligation to do justice rests upon all persons, natural or artificial, and the law will compel restitution from a person who obtains money or property from another * * * unjustly, or without authority.' (*Pink* v. *Title Guarantee & Trust Co.*, 274 N. Y. 167, 173.) " (*MacMurray* v. *City of Long Beach*, 292 N. Y. 286, 290–291.)

Actual bad faith and intent to deceive is not always an essential element in a cause of action for deceit. Such intent may exist where one asserts a thing to be true which he does not know to be true since it is fraud to affirm positive knowledge of something one does not positively know. " Where a party represents a material fact to be true to his personal knowledge, as distinguished from belief or opinion, when he does not know whether it is true or not and it is actually untrue, he is guilty of falsehood, even if he believes it to be true, and if the statement is thus made with the intention that it shall be acted upon by another, who does so act upon it to his injury, the result is actionable fraud." (*Hadcock* v. *Osmer*, 153 N. Y. 604, 608.) " Fraud includes the pretense of knowledge when knowledge there is none." (*Ultramares Corp.* v. *Touche*, 255 N. Y. 170, 179.) Thus, words or conduct asserting the existence of a fact constitute a misrepresentation if the fact does not exist. (Restatement, Torts, § 525. See *Kountze* v. *Kennedy*, 147 N. Y. 124, 130; *Marsh* v. *Falker*, 40 N. Y. 562; *Bennett* v. *Judson*, 21 N. Y. 238; *Deyo* v. *Hudson*, 225 N. Y. 602, 612; *Adams* v. *Clark*, 239 N. Y. 403; *Abel* v. *Paterno*, 245 App. Div. 285; *Metropolitan Life Ins. Co.* v. *Becraft*, 213 Ind. 378; *McLearn* v. *Hill*, 276 Mass. 519, and *Trust Co.* v. *Fletcher*, 152 Va. 868.)

There can be no fraud in law or in fact without a breach of some legal or equitable duty. The relationship must be such

that one making the representation owes a duty of care. Courts of law and equity are governed by the same principles in giving relief in cases of fraudulent misrepresentation. (*Smith* v. *Countryman,* 30 N. Y. 655, 680.) The State was given the absolute care, custody, control and superintendence of the Forest Preserve and was authorized to bring any and all actions and proceedings which an owner of land would be entitled to institute. (*People ex rel. Forest Comm.* v. *Campbell,* 152 N. Y. 51, 57.) This material misrepresentation was due to lack of care rather than to dishonesty. But, there is more here than mere negligence or contravention of equitable principles. The State was under a duty to make a reasonable investigation before it threatened prosecution and to the extent it failed in the performance of this duty, we think lack of knowledge may not have absolved it from an inference sufficient to imply deceit. Ordinarily, negligence does not include a purpose to do a wrongful act. It may, however, be evidence of fraud. The allegation of ownership was untrue, and, because it was untrue as to a matter of record title, vital to the accusation, it implied deceit, under the circumstances in this case, of the same nature and effect as an actual and deliberate misrepresentation of fact. (See *Lapiedra* v. *American Sur. Co.,* 247 N. Y. 25.) Here, the determination of nonownership was basic and not a mere incident to the legal cause of action as in *Trimmer* v. *City of Rochester* (134 N. Y. 76) and kindred cases. *Hopkins* v. *Lincoln Trust Co.* (233 N. Y. 213) has no application. It merely interprets chapter 480 of the Laws of 1920 as not reviving extinguished rights. It does not deny its application to rights accrued but not extinguished. The facts permit and give support to the inference that the State knew that its ownership of the flooded area was doubtful and unresolved. The evidence permits and supports a finding that the State was chargeable with knowledge. " Knowledge of facts, which, to the mind of a man of ordinary prudence, beget inquiry, is actual notice, or, in other words, is the knowledge which a reasonable investigation would have revealed." (*Fidelity & Deposit Co. of Maryland* v. *Queens Co. Trust Co.,* 226 N. Y. 225, 233.) One who has reasonable grounds for suspecting or inquiring ought to suspect or to inquire and the law charges him with the knowledge which the proper inquiry would disclose. The State is presumed to have intended the natural and probable effects of its acts and representations.

Heedlessness and reckless disregard of consequence may take the place of deliberate intention. (*State St. Trust Co.* v. *Ernst,*

278 N. Y. 104, 112.) Fraud is one of the broadest issues known to the law, for it can seldom be proven by direct evidence, but is dependent upon circumstances which, separately considered may be quite immaterial, but when combined are not only material but have great persuasive force. Since the celebrated case of *Pasley* v. *Freeman* (3 T. R. 51) our courts have recognized in the law that fraud or deceit accompanied with damage is a good cause of action. (See 3 Blackstone's Comm., p. 165.) The law alone or natural equity produced the obligation by rendering obligatory the facts from which it results. Here, we have misrepresentation of the basic fact from which the cause of action sprang, and upon which it was based. This vital representation was made in such a manner and in such terms as was calculated to and did produce the conviction in the mind of the accused, that the State's representatives had personal knowledge of its truth.

Reckless and ruthless misrepresentation may be fraud. Negligence or blindness to the obvious may be evidence to sustain an inference of fraud. Concealment of facts which one is duty bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact. The representation being untrue and influential vitiated the transaction whether such representation was willfully and designedly false or ignorantly or negligently untrue. (*Taylor* v. *Fleet*, 1 Barb. 471.) Fraud is the gravamen of this action because there would be no injury except for the fraud. (See *Emmerich* v. *City Bank Farmers Trust Co.*, 300 N. Y. 417, and cases cited.) Here, we find that reckless indifference to error, or that pretense of exact knowledge, which will sustain an action for deceit. We think the elements of representation and reliance of a common-law action of deceit are present.

An involuntary payment imports a payment made against the will of the person who pays. (*Tripler* v. *Mayor of City of New York*, 125 N. Y. 617, 625.) Whether a payment is in truth voluntary, i.e., whether it was meant to be made in renunciation of any adverse right, has been held to be a question of intention. (*People ex rel. Wessel, Nickel & Gross* v. *Craig*, 236 N. Y. 100, 105.) That the State obtained money without right or title, and that it knew or should have known that it had none, excludes the idea that it was received contractually. (*People ex rel. Dusenbury* v. *Speir*, 77 N. Y. 144.) Any claim of compromise or settlement finds no substance in what actually took place. The basis for the penalty was void because of the existence of facts dehors the records. If the State had not accepted the affirmative

responsibility of sole ownership, there could have been no penalty. The payment of the penalty by Low, Sr. was not voluntary. Back of the payment there lies the substance of submission to the coercive power of the State. (See *Oswego & Syracuse R. R. Co.* v. *State of New York,* 226 N. Y. 351; *Peyser* v. *Mayor of City of New York,* 70 N. Y. 497; *Dunham* v. *Griswold,* 100 N. Y. 224, and *Bruecher* v. *Village of Port Chester,* 101 N. Y. 240.) To avoid an illegal penalty and retain possession of goods, the payment of higher duties was held to be a clear case of duress in fact in *Robertson* v. *Frank Brothers Co.* (132 U. S. 17).

Claimant is entitled to the full benefit of the distinction between "claim accrued" and "cause of action accrued". The time when the "cause of action" has accrued, as that term is used in those provisions of the Civil Practice Act, limiting the periods within which actions must be commenced, means the time when the claimant first became enabled to maintain this action. (*Cary* v. *Koerner,* 200 N. Y. 253, 259.) It has always been the law of this State that a cause of action did not accrue until someone was in a position to bring and maintain the action. (*Crapo* v. *City of Syracuse,* 183 N. Y. 395; *Jensen* v. *Metropolitan Life Ins. Co.,* 251 N. Y. 336, 339) and in *Jacobus* v. *Colgate* (217 N. Y. 235, 245) in applying the above rule Judge CARDOZO stated: "A cause of action does not accrue until its enforcement becomes possible." The general rule is the same in other jurisdictions. (*Federal Reserve Bank* v. *Atlanta Trust Co.,* 91 F. 2d 283; *Dean* v. *Iowa-Des Moines Bank,* 227 Iowa 1239; *Young* v. *City of Seattle,* 30 Wn. 2d 357; Note 3 A. L. R. 2d 704.) It cannot be said that a person should assert a right before he has knowledge of, or is chargeable with knowledge of, the same. (*Metropolitan Life Ins. Co.* v. *Oseas,* 261 App. Div. 768, affd. 289 N. Y. 731; *Wendel Foundation* v. *Moredall Realty Corp.,* 176 Misc. 1006; *Bicknell* v. *Hood,* 168 Misc. 127; *Holmberg* v. *Armbrecht,* 327 U. S. 392; *Scarsborough* v. *Atlantic Coast Line R. Co.,* 178 F. 2d 253, Note 15 A. L. R. 2d 500, certiorari denied 339 U. S. 919.) The "law does not seek to compel a man to do that which he cannot possibly perform". (*Murphy* v. *Village of Ft. Edward,* 213 N. Y. 397, 402; *Matter of Brown* v. *Board of Trustees of Hamptonburg School Dist.,* 303 N. Y. 484, 490.) This is a case where failure to disclose knowledgeable basic facts actually prevented the claimant from seeking a recovery of his due. Here the claimant's consciousness of the wrong was not aroused until long after the limitation period of the general statute. It was then apparent that there was prerequisite liti-

gation that must be determined before any claim could be presented to the court. When the facts or conditions fixing the right to sue must be ascertained by judgment in a judicial proceeding, the statute does not begin to run until the right of action has been ascertained by such proceedings and judgment. (*Shepard Co.* v. *Taylor Pub. Co.*, 234 N. Y. 465, 468; *Ga Nun* v. *Palmer*, 202 N. Y. 483; *Butterbaugh* v. *Loew's, Inc.*, 168 Tenn. 284; *Maguire* v. *Hibernia Sav. & Loan Soc.*, 23 Cal. 2d 719.)

It has been held in many jurisdictions that fraudulent concealment of the existence of a cause of action which in fact induces the possessor of the cause of action to refrain from bringing an action thereon until after it has become barred by the Statute of Limitations, gives rise to an action for deceit. (*Desmarais & Co.* v. *People's Gas Light Co.*, 79 N. H. 195; *Cockrill* v. *Hall*, 65 Cal. 326; *Clark* v. *Amos*, 144 Kan. 115; *Ott* v. *Hood*, 152 Wis. 97; *Stetson* v. *French*, 321 Mass. 195.) There is perhaps a like suggestion in *Spallholz* v. *Sheldon* (216 N. Y. 205, 208) and *Koerner* v. *Apple* (198 App. Div. 540, 544) where the court mentions yielding of rights or foreclosure of any remedy. And the Court of Appeals stated in *Brick* v. *Cohn-Hall-Marx Co.* (276 N. Y. 259, 264): " If there were fraud extraneous to the contract, lulling the plaintiffs into the belief that the money had been paid or would be paid, a different situation might arise. The plaintiffs in such a case would have a cause of action for the damages caused by the fraud in inducing them to let the Statute of Limitations arise." (See *Safrin* v. *Friedman*, 96 N. Y. S. 2d 627, 631, affd. 277 App. Div. 1138.)

The judgments that were entered upon the decisions of the Supreme Court are conclusive upon the issue of ownership and preclude any attempt at relitigation. (*Culross* v. *Gibbons*, 130 N. Y. 447, 454.) The courts did not hold that any Statute of Limitations had run in any of these actions. The tendency of the latest decisions of the Court of Appeals has been to extend to all claims the benefit of the exceptions to the bar of the statute. (*Chapin* v. *Posner*, 299 N. Y. 31.) The Statute of Limitations is one of repose, based upon the theory that the mists of time prevent the actual facts from appearing. A technical and conceptualistic application to the facts herein, is inconsistent with natural justice. Rather, we think, should it be realistic and humane. It has often been said that a primary purpose of statutory limitations in general has been the prevention of fraud. The entry of final judgment was properly withheld pursuant to the interim opinion of Mr. Justice IMRIE and was not a mere ministerial act. It was necessary under the

statute-and was the only adjudication of the partitioned lands. There was nothing to prevent the State from moving on its own account. The claim is timely.

The measure of damages in an action for deceit is firmly established. Claimant is entitled to indemnity for the actual pecuniary loss sustained as a direct result of the wrong. (*Hanlon* v. *Macfadden Publications,* 302 N. Y. 502, 511.) A. Augustus Low, as administrator with will annexed of Abbott Augustus Low, deceased, is entitled to an award against the State of New York in the sum of $20,000.

Let judgment be entered accordingly.